**Mary Ellen RAUENHORST, Trustee, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant and Third-Party Plaintiff,**

v.

**Barbee Lee BELLOWS, Personal Representative of the Estate of Howard A. Bellows, deceased Third-Party Defendant.**

**SOUTHWEST AIRCRAFT LEASING, INC., a Minnesota corporation, Plaintiff,**

v.

**UNITED STATES of America and Its Agency the Federal Aviation Administration, Defendants.**

**UNITED STATES of America, Plaintiff,**

v.

**SOUTHWEST AIRCRAFT LEASING, INC., a Minnesota corporation, Charles T. Hvass, Hvass, Weisman, and King, Attorneys at Law, Dean K. Johnson, Michael Lindberg, Johnson and Lindberg, P.A., W.D. Flaskamp, Meagher, Geer, Markham, Anderson, Adamson, Flaskamp and Brennan, Attorneys at Law, Jack Beaulieu, First Adjustment and Survey Company, American States Insurance Company, Aviation Office of America Incorporated, Defendants.**

Civ. Nos. 4–79–241, 4–79–562 and 4–84–864.

United States District Court, D. Minnesota, Fourth Division.

Feb. 22, 1985.

Charles T. Hvass, Hvass, Weisman & King, Minneapolis, Minn., for plaintiffs in Civil No. 4–79–241.

Gary W. Allen, and James P. Piper, Civ. Div. Torts Branch, U.S. Dept. of Justice, Washington, D.C., for United States of America in Civil No. 4–79–241 and Civil No. 4–84–864.

W.D. Flaskamp, Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, Minneapolis, Minn., for third-party defendant in Civil No. 4–79–241 and himself and defendant Meagher, Geer, Markham, Anderson, Adamson, Flaskamp and Brennan, in Civil No. 4–84–864.

Michael Lindberg, Bloomington, Minn., for plaintiff in Civil No. 4–79–562.

David D. Alsop, Gislason, Dosland, Hunter & Malecki, Minnetonka, Minn., for defendants Jack Beaulieu and First Adjustment and Survey Company in Civil No. 4–84–864.

J. Michael Dady, Lindquist & Vennum, Minneapolis, Minn., for defendants Dean K. Johnson, Michael Lindberg, and Lindberg & Johnson in Civil No. 4–84–864.

Robert M. Austin, Austin, Roth & Associates, Minneapolis, Minn., for defendants American States Insurance Company and Aviation Office of America, Inc., in Civil No. 4–84–864.

William T. Egan, Rider, Bennett, Egan & Arundell, Minneapolis, Minn., for defendants Charles T. Hvass and Hvass, Weisman & King in Civil No. 4–84–864.

## MEMORANDUM OPINION AND ORDER

DIANA E. MURPHY, District Judge.

Before the court are motions in several actions arising from the same airplane crash. Defendant and third-party plaintiff United States of America has moved for relief from judgment under Rule 60(b)(3) of the Federal Rules of Civil Procedure in two cases previously tried before this court, *Rauenhorst v. United States*, Civil No.

4–79–241, and *Southwest Aircraft Leasing, Inc. v. United States,* Civil No. 4–79–562. The United States has also brought an independent action for fraud seeking damages in excess of fourteen million dollars from attorneys and other parties involved in the investigation of the crash and the resulting litigation, *United States v. Southwest Aircraft Leasing, Inc., et al.,* Civil No. 4–84–864. The new action is before the court upon motions of the defendants [1] to dismiss or in the alternative for summary judgment and of the United States to amend its complaint. In all of the actions the parties opposing the United States seek the imposition of sanctions including attorneys' fees.

## I. BACKGROUND

These cases arise out of the July 12, 1978 airplane crash of a Beechcraft Duke airplane owned by Southwest Aircraft Leasing, Inc. (Southwest). The pilot, Howard A. Bellows, and all five passengers were killed in the crash. Trustees for the estates of the five passengers brought a negligence action against the United States. The United States settled with the five plaintiffs for $3,926,310.00.[2] Remaining for trial was the United States third-party action for contribution and/or indemnity against the estate of the pilot Bellows. The United States claimed Bellows' negligence as pilot caused the accident. This third-party action was consolidated and tried to the court with the action of Southwest against the United States for $122,422.80, the stipulated value of the airplane. In that case the United States brought a counterclaim for contribution and/or indemnity against Southwest on the grounds

that Bellows was Southwest's agent under Minnesota law.

On March 27, 1984, the court issued a Memorandum Opinion and Order for Judgment finding both the United States and the pilot Bellows negligent and assessing 90% of the responsibility to the United States. Thus, Bellows' estate and Southwest were liable to the United States for 10% of the settlement paid to the estates of the passenger or $392,631.00. And the United States was found liable to Southwest for 90% of the value of the airplane or $110,180.52. This court found that the government air traffic controllers agreed to route the plane around bad weather and then failed to exercise reasonable care in not providing the pilot, Bellows, with vectors around the thunderstorm into which the aircraft flew. The unrefuted testimony of expert witness John Prodan was that the airplane flew into the northern or northwestern portion of a rapidly building thunderstorm. It was then buffetted and forced into a sharp turn by extreme downdrafts and updrafts. This caused the plane to break up in the air, catch fire, and crash. Bellows was also found to be negligent in his failure to take certain measures to alert the handoff air traffic controller of his situation. Judgment was entered on March 28, 1984. No post-trial motions were made, and no appeal was taken from the judgment.

Now the United States claims that it is entitled to relief from the judgment under Rule 60(b)(3) on the grounds of surprise, fraud, misrepresentation, and other misconduct. It alleges that opposing counsel wrongfully concealed a critical piece of evidence—a six-inch long metal punch allegedly found in the rubberized fuel cell of the

---

1. Defendant Southwest Aircraft Leasing, Inc. (Southwest) is the only defendant that has not brought such a motion. It had not yet obtained counsel at the time the motions were brought, but its position and that of the United States in opposition have been fully developed through the other parties' motions. In the circumstances of this case it would appear that Southwest would not be liable unless its agents or attorneys had committed fraud. Because of this court's rulings as to other parties, there appears

to be no basis in fact or law by which the United States could prevail against Southwest. This matter is therefore also ripe for determination.

2. The parties stipulated that $3,926,310 was a reasonable settlement amount. The United States also paid approximately $750,000 to the estate of Bellows in settlement of that estate's wrongful death claim.

aircraft that crashed. It asserts in its complaint in the action for damages that the punch "most probably was the initiation of the sequence of events which led to the crash" of the aircraft.[3] The action for damages is similarly based upon this allegedly fraudulent conduct and is brought against those parties that knew of and failed to disclose the existence of the punch.

Twelve parties, all involved in some capacity with the prior litigation, are named as defendants in the action for damages. Dean K. Johnson, Michael Lindberg, and their law firm of Lindberg and Johnson, Attorneys at Law [4] were counsel for American States Insurance Company (ASIC) and Aviation Office of America, Inc. (AOA) who issued the insurance policy to Southwest on the aircraft itself. ASIC and AOA are also named defendants in this action. In 1979, Johnson along with Joe E. Thompson signed the complaint as attorneys for Southwest in its property damage action against the United States.[5] ASIC and AOA disputed coverage under Southwest's policy, up until the time the policy was held valid in a declaratory judgment action before the district court and the Eighth Circuit Court of Appeals. *See American States Ins. Co. v. Southwest Aircraft Leasing, Inc.*, Civ. 4–81–541 (Lord, C.J. 1982), *aff'd*, 717 F.2d 1189 (8th Cir.1983). Accordingly, the actual trial of Southwest's property claim involved only the insurer's subrogation interest. Southwest was represented at the trial by Michael Lindberg. W.D. Flaskamp and the law firm of Meagher, Geer, Markham, Anderson, Adamson,

Flaskamp and Brennan were retained by ASIC to represent the insurer's interest in the United States claim for contribution and/or indemnity against the estate of Howard A. Bellows. Charles T. Hvass and the law firm of Hvass, Weisman, and King represented the trustees of the five passengers who died in the crash. Jack Beaulieu and the First Adjustment and Survey Company, of which Beaulieu is co-owner, engaged in an investigation of the crash on behalf of ASIC and AOA.

The punch was first discovered in the late fall of 1978 by Clarence Schroeder, an employee of River Bend Aero (River Bend), River Bend is a salvage and rebuilding company hired by AOA to transport the aircraft from a Faribault, Minnesota storage site where it remained after the crash to the River Bend facility. The National Transportation Safety Board (NTSB) had maintained possession of the aircraft from shortly after the crash until October 16, 1978 when it completed its investigation into the crash.[6] At that time, Jack Beaulieu made arrangements on behalf of the insurer and Dean Johnson to have the airplane removed to the River Bend facility.

Schroeder, who is nicknamed "Chicken", claims to have discovered the punch lying inside an exposed fuel cell bladder while he was attempting to remove the left wing of the airplane. The punch appeared to Schroeder to be approximately six inches in length and rusted. He removed the punch from the rubberized fuel cell and placed it in his tool box, where it remained for al-

---

**3.** The United States has filed a motion to amend its complaint. The amended complaint omits the quoted language and states more generally that there were false representations of material facts that deprived the United States of a defense to the allegations and induced it to enter into the settlements.

**4.** The law firm of Johnson and Lindberg, P.A. was formed in 1982. Prior to that time the firm was known as Dean K. Johnson Law Offices, P.A. Lindberg's employment with the firm dates back to 1976.

**5.** The United States seeks to amend its complaint to add Joe E. Thompson as a defendant. Thompson originally represented Southwest in

its action against the United States for the loss of the plane, but did not represent them at the trial of the action. Thompson has filed a memorandum and affidavit in opposition to the proposed amended complaint. He was also present in court at the hearing on these motions.

**6.** On that day NTSB air safety investigator Robert D. Johnson signed a release form indicating that "all wreckage is hereby released to the registered owner for appropriate disposition." *See* Bellows Memorandum in Opposition to United States Motion to Vacate Judgment, Exhibit A.

most a year. He told no one of this discovery. In September of 1979, Schroeder assisted in loading the remains of the airplane for transportation to Packer Engineering in Naperville, Illinois. The move was made at the informal request of Charles Hvass, counsel for the passengers and was acceded to by Dean Johnson.

At the time of the loading, Schroeder informed his employer, Walter Wermerskirchen, of the existence of the punch and turned it over to him. Wermerskirchen states in his affidavit that this information seemed significant to him so he tried unsuccessfully to contact Jack Beaulieu and then contacted Dean Johnson and informed him of the punch. He indicates that after a delay he was told by Johnson to transport the aircraft but to retain the punch. The punch eventually was turned over to Beaulieu and it remained in his files until the commencement of this litigation.

Through his conversations with Wermerskirchen and Beaulieu, Johnson became aware of the possibility that this punch might have some connection with the crash of the aircraft. In a letter of November 14, 1979 Johnson noted:

> The appearande (sic) of this tool, with respect to rust etc., lead (sic) the River Bend employee that the tool had gotten into the fuel bladder before the crash; further, the weight and configuration of the tool was such that, as the plane passes through turbulence, the tool might have banged about in the bladder in direction and with forces such that the bladder could have been perforated (sic).
>
> ... [W]hat immediately caught Jack's attention was a possible connection between the pereration (sic) of the fuel bladder, on the one hand, and, on the other hand, the final words heard from someone in the insured aircraft, to the effect that hair and shoes were on fire.

Deposition of Dean Johnson, Exhibit 2.

The punch's existence was revealed to other parties over the course of the litigation arising out of the crash, but not to the United States. Johnson concluded in the November 1979 letter that there was no obligation to disclose information concerning the punch.[7] In February of 1980, Johnson noted in an internal memo to Michael Lindberg that if the United States became aware of the punch, it could argue that the plane was suffering from an inherent defect.[8] On April 8, 1980 Johnson revealed the existence of the punch to Flaskamp who shortly thereafter informed Hvass about it.[9]

---

7. The letter was addressed to Robert Scott of the Aviation Adjustment Company and provided in part:

> After some thought on this discovery, I have concluded that none among us who have the knowledge are right now under any obligation to come forward with this information and to disclose it, say, to attorney Hvass representing the families of the passengers, or to attorney *Rischmiller* representing the family of pilot Bellows nor the NTSB investigator. Instead, it appears that we may rightfully preserve this knowledge privately in the interest of American States, to await the next turns that the litigation may take.

Deposition of Dean Johnson, Exhibit 2.

8 I concluded that, short-term, I would not reveal it, say, to Hvass, because I wanted American States to have a bargaining position if Hvass turned his attention away from the government and to the pilot. That is to say, if it became common knowledge that the punch might have perforated the bladder, the government could argue that the storm into which Bellows flew was not violent enough to tear the airplane apart but merely bumpy enough to damage a plane which was suffering an inherent defect.

*Id.* at Exhibit 4.

9. There is some dispute as to when these conversations took place and exactly what information was passed on. There is no dispute that Flaskamp was informed of the punch and of the statement given by Schroeder. An internal memo of Johnson's dated April 18, 1980 states that Flaskamp opined that "this alternative [theory] would be an incentive for Hvass to emphasize and accelerate his case against the government and ... he would take responsibility for revealing the alternative theory to Hvass." *Id.* at Exhibit 7.

Flaskamp takes exception to several of the statements in the April 18, 1980 memo and states that to the best of his recollection the discussions about an alternative theory never occurred. He indicates that he was informed of the punch by Wermerskirken at a meeting in his office on an unrelated matter. During the meeting he contacted Hvass by telephone and in-

In the interim period, Southwest had been served in its action for hull damage with a set of interrogatories from the United States. The interrogatories were directed to Joe Thompson and Dean Johnson as counsel of record for Southwest. Three of the interrogatories and the responses received are central to the claim that information about the punch was fraudulently withheld. These particular interrogatories were answered by Dean Johnson. The interrogatories were sent on December 6, 1979, and Southwest's responses sent on April 10, 1980.[10] The pertinent requests and responses were as follows:

7(a). Has the plaintiff or any of its attorneys, agents or employees interviewed and reduced to writing statements (whether or not signed by the persons interviewed) from any persons having or purporting to have knowledge or information pertaining to the accident alleged in the complaint.

The answer given was No.

7(b). If any statements have been obtained, identify and describe the contents of each such statement, indicating the name and address of the person so interviewed, when interviewed, where interviewed, by whom interviewed, and the name and address of the person, firm, or corporation having possession or custody of each such statement.

No answer was given.

8. State the names and addresses of any persons, other than those mentioned in your answer to the preceding interrogatory whom you believe have or may purport to have any knowledge or information pertaining to the incident or circumstances surrounding the accident alleged in the complaint and state, insofar as you know, the nature of such knowledge or information.

The answer in pertinent part stated:

B. J.B. Beaulieu, aircraft surveyor, with first Adjustment & Survey Co., Minneapolis, Minnesota, conducted investigation on behalf of hull/liability insurer of plaintiff.

C. Employees of River Bend Aero, Inc., an aircraft salvage buyer of Monticello, Minnesota, recovered the wrecked airplane from the accident site and had it in storage for a time.

D. The wrecked airplane is believed now to be in the possession of Packer Engineering, Naperville, Illinois.

16. As to each and every portion of the wreckage including but not limited to airframe, engines, avionics, instruments and propellers state the following:

(a) Address of present location:

(b) Name and address of the custodian:

(c) Whether you will produce the wreckage and any portions of it for inspection and photographing by counsel for the defendant, United States, without the necessity of a formal motion for production.

Southwest's responses were:

(a) Believed to be at Packer Engineering.

(b) Believed to be Naperville, Illinois.

---

formed him of the punch's existence as described by Wermerskirchen. He states that after his conversation with Hvass, he contacted Johnson and indicated his surprise and shock that he had not been informed of the punch. The next day, April 9, 1980 there was a pretrial conference where the punch was discussed further and he obtained a copy of Schroeder's statement from Johnson. He also details in an additional conversation in which he asked Hvass to question the NISB investigator at his deposition about the existence of evidence of any foreign object being on the aircraft. Deposition of W.D. Flaskamp 34–62.
Flaskamp is currently withholding production of two letters, based on the attorney-client privilege, which he wrote to Robert Scott of AOA in the month of April 1980 after learning of the

punch. The United States indicated that it would move to compel production of those letters, but it has not done so. *See* United States Memorandum in Opposition to Summary Judgment at 12. The court has, at the request of Flaskamp, conducted an *in camera* review of these documents and finds that even if production were warranted, they would not lead to a different result as to any of the rulings on these motions.

**10.** Johnson had earlier sent a letter to Donald Sime, the attorney representing the United States, informing him that additional time would be needed because full and complete answers would have to come both from Johnson's files and co-counsel Thompson's files.

(c) Plaintiff Southwest does not presently have control over the wreckage or any portion of it.

By letter of November 14, 1980 Dean Johnson supplemented the interrogatory answers as follows:

By way of supplement to Interrogatory Answers which were served April 10, 1980, it is the case that the American States Insurance Company, as hull/liability insurer of the Southwest Aircraft Leasing Co. Beech has a statement from one of the employees of salvor River Bend Aero which is identified in interrogatory answer 8C.

I do not have a copy of the statement but I believe the employee is identified by the nickname "Chicken".

Deposition of Dean Johnson, Exhibit 9. This supplementation was incorrect in part because Johnson did have in his file a copy of the statement given by "Chicken". Johnson claims that he believed that he had given the statement to Flaskamp and subsequently failed to review his file before drafting the letter. In addition, the supplementation appears to have been directed to interrogatory 7, but it did not include any of the information requested by interrogatory 7(b).

Interrogatory requests were also answered by attorney Charles Hvass as counsel for the trustees of the passengers. Interrogatory number 20 stated: "State the location and custodian of the wreckage and any portion of the wreckage of N777HH. It was answered: "Portions of the wreckage of N777HH are located with the following: Charles Morin, Packer Engineering, Naperville, Ill.[;] Walter Wermerskirchen, Wermerskirchen Aircraft Salvage, Monticello, Mn.[;] It is also possible that certain portions of the wreckage are still in the custody of the National Transportation Safety Board."

In addition, Donald Sime, counsel for the United States, states that he contacted Hvass by telephone about having the wreckage examined by an expert for the United States.[11] Sime had received the interrogatory responses from both Southwest and the passengers prior to making this request. He subsequently made arrangements for William Allen to inspect the airplane wreckage at the Packer Engineering facility in Naperville, Illinois to look for alternative causes of the crash. The inspection was made by Allen without any knowledge of the existence of the punch, and no subsequent inspection was made by the United States.

No other party was served with any discovery requests that might possibly be related to the punch. The only interrogatories received by Flaskamp as attorney for the estate of Bellows related to the medical certification of Howard Bellows.[12] Beaulieu had the punch in his possession and was aware of the discussions concerning it through correspondence from Johnson. ASIC and AOA were represented by Johnson and Flaskamp in the various litigation and they had hired Beaulieu to investigate the crash. They were aware of the punch through communications from their attorneys to Robert Scott of their adjustment company, Aviation Adjustment Company.

---

11. What I can remember is I talked to Charlie Hvass on the telephone and told him that I wanted to look at the wreckage. Now, I don't know that I talked to Dean Johnson or Mike Lindberg on that same subject or not.

 \* \* \* \* \* \*

Q. Did he tell you the wreckage was located at Packer Engineering?
A. I am sure he did.

 \* \* \* \* \* \*

A. I cannot remember the words he said. I remember calling him and talking to him about my having the wreckage examined. I also remember telling Bill Allen that he had to go to Packer Engineering in Naperville, Illinois, [t]o see it.

I guess I am deducing that there is a relationship there, that Mr. Hvass told me. Whether I already knew it from the answers to interrogatories, or whether Mr. Hvass told me, I guess I can't remember that specifically.

Deposition of Donald Sime 97–104.

12. The United States argues that Flaskamp's appearance on behalf of Southwest, in answering the United States counterclaim in the action brought by Southwest for hull damage, may have given rise to some duty in regards to the interrogatory responses.

The United States did not become aware of the existence of the punch until after the completion of the litigation when an anonymous phone call was received by the local United States Attorney's Office "concerning a 'foreign object' which had been found in one of the fuel tanks of the aircraft." [13] The United States then obtained affidavits from Schroeder and Wermerskirchen and contacted Donald Sime, the attorney who was responsible for this litigation for the United States from 1978–1982 who had since left the Justice Department.

The present Rule 60(b) motion was filed on August 14, 1984. It was accompanied by the affidavits, the interrogatories directed to Southwest and its answers, and a copy of the December 7, 1979 statement of Clarence Schroeder given to Jack Beaulieu. The separate action for damages was also filed on August 14, 1984.

## II. MOTION FOR RELIEF FROM JUDGMENT

The United States asserts that the failure to divulge the existence of the punch in response to its interrogatories and the efforts to conceal the punch are exactly the types of misconduct that under Rule 60(b)(3) necessitate a new trial. It asserts that the answers to interrogatories 7, 8, and 16 were fraudulent. It notes that Schroeder's statement was not revealed in response to interrogatory 7 until November 1980, and no detailing of the statement's contents was ever given as requested in 7b. Also, the responses to interrogatory 8 failed to give "the nature of such knowledge or information" possessed by the individuals named. Finally, it finds the failure to disclose the existence of the punch in response to the request in interrogatory 16 for information about the "wreckage" to be the most egregious omission and misstatement.

It argues that the parties' failure to disclose their knowledge of the punch prevented it from developing and presenting an alternative theory of the cause of the crash to that of air traffic controller negligence. It concludes that a new trial is mandated because this alternate theory of liability was potentially critical to its claims and defenses.

Both Southwest and Bellows assert that the motion is baseless and that sanctions should be imposed against the United States for bringing it. Southwest is the central character in this motion because it was served with the interrogatories concerning the wreckage of the airplane and any individuals with knowledge of the crash.

Southwest classifies its alleged misconduct as a failure to communicate information about the punch. It asserts that its only duty in that regard was to comply with the rules of discovery in answering the interrogatories—which it did. It also asserts that there is no showing that the United States was prevented from fully and fairly presenting its claims and defenses. In support of this position it notes that the interrogatory responses provided the names of the two witnesses on whose affidavits the United States now relies in support of its motion. Furthermore, the United States had interrogatory answers from the passengers indicating that some of the wreckage might be with Wermerskirchen. Finally, it points out that the interrogatory responses were supplemented to indicate that Southwest had a statement from "Chicken". It claims that the United States did not discover the punch simply because it failed to conduct even minimal discovery efforts which would have revealed the punch's existence.

The position taken on behalf of Bellows is that she had no duty to disclose any information concerning the punch because she was never served with any discovery requests relating to the punch. Furthermore, the third-party contribution action against her was based solely on pilot negligence. A new trial could not produce any

---

**13.** Shortly after publication of its findings and order for judgment of March 27, 1984, this court received an anonymous phone call concerning the completed litigation. The caller stated a foreign object had been found in the plane; he was referred to the United States Attorney.

evidence of a greater degree of negligence on the part of Howard Bellows.

*Discussion*

The United States seeks relief from judgment under Rule 60(b)(3) which provides:

On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party.

Fed.R.Civ.P. 60(b)(3).

■ Rule 60(b)(3) provides for extraordinary relief which may only be granted "upon an adequate showing of exceptional circumstances." *Hoffman v. Celebrezze,* 405 F.2d 833, 835 (8th Cir.1969). A Rule 60(b)(3) motion is viewed with disfavor and is addressed to a district court's discretion which will not be disturbed in the absence of abuse. *Rosebud Sioux Tribe v. A & P Steel, Inc.,* 733 F.2d 509 (8th Cir.), *cert. denied,* — U.S. ——, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984). The court is asked to balance the competing policies of the sanctity of final judgments and the command that justice be done in light of all the facts. *Id.* at 515.

■ In order to obtain relief under Rule 60(b)(3) a party must establish the fraud, misrepresentation or other misconduct by clear and convincing evidence. *Jennings v. Hicklin,* 587 F.2d 946, 947–48 (8th Cir.1978); *Rozier v. Ford Motor Co.,* 573 F.2d 1332, 1339 (5th Cir.1978). The conduct complained of must also be such as prevented the losing party from fully and fairly presenting his case or defense. *Toledo Scales Co. v. Computing Scale Co.,* 261 U.S. 399, 421, 43 S.Ct. 458, 463, 67 L.Ed. 719 (1923); *Rozier v. Ford Motor Co.,* 573 F.2d at 1339. The determination as to whether the presentation of a full and fair case or defense has been prevented is one of degree; the decision lies within the court's discretion and does not require that a new trial would probably produce a new result, the standard applied under Rule 60(b)(2). *Rozier v. Ford Motor Co.,* 573 F.2d at 1339 & n. 4.

■ Rule 60(b)(3) may be properly applied to misconduct in withholding information called for by discovery. *Id.* at 1339. Whether the United States has made the necessary showing of misconduct depends upon a close evaluation of its interrogatory requests, the answers to those requests, and how the United States used the answers.[14]

■ An evaluation of all those factors leads to the conclusion that the United States has failed to carry its burden of establishing misconduct by clear and convincing evidence. Southwest's interrogatory answers, although less than perfect, nevertheless provided the United States with access to all of the information it eventually used to bring this motion. The United States' failure to pursue that information or to request more detailed or additional responses weighs against a finding of misconduct under Rule 60(b)(3).

An examination of Southwest's responses to interrogatories 7, 8, and 16 highlight this result. Dean Johnson answered these interrogatories on Southwest's behalf. Johnson's initial answer to interrogatory 7 was that no statement had been taken; obviously this did not give the United States cause to seek additional information. At that time, however, Johnson believed that the coverage dispute provided a valid reason for not revealing the statement. The United States was aware of the cover-

---

**14.** The allegations of misconduct against Bellows arise from her attorney W.D. Flaskamp's knowledge of Johnson's failure to reveal the punch's existence and his own conduct in connection with the punch. To a large extent, therefore, any misconduct by Bellows is dependent on whether Southwest's responses were fraudulent and the extent to which Flaskamp was aware of the fraud. It appears that the

age dispute and its possible ramifications on the pending actions.[15]

■ Regardless, the answer was supplemented on November 14, 1980 after the policy was held valid in a state court action in August of that year.[16] The supplemental answer informed the United States that ASIC as hull insurance carrier for Southwest had in its possession a statement from an employee of River Bend. The answers to interrogatory 8 informed it that employees of River Bend had received the wrecked airplane from the accident site and had it in storage for a time. The answers to interrogatory 8 also gave the names of Walter Wermerskirchen and Jack Beaulieu and noted that Beaulieu had conducted an investigation on behalf of ASIC.

If the United States had followed up on the answers to interrogatories 7 and 8, it could have obtained all of the information that was subsequently revealed to it and on which it brought this motion. If it had pursued the names of Wermerskirchen, Beaulieu, or "Chicken" it would have been learned what these individuals knew. If it had pursued the supplemental response it could have obtained the statement made by Schroeder. The conduct of Wermerskirchen and Schroeder in coming forward with information about the punch after the trial indicates that they would have cooperated with any inquiries by the United States concerning the crash.

It is somewhat inconsistent for the United States now to assert that these answers were fraudulently incomplete or misleading when it failed to seek either informally or formally any supplementation of the answers. If it had sought additional information, there is no indication that the parties would not have cooperated; and if necessary, it could have sought the information through formal depositions or discovery motions to the court.[17]

---

United States also attempts to allege an independent basis for the misconduct of Bellows.

**15.** In a letter to the court dated December 23, 1981, Michael Lindberg described the coverage dispute between Southwest and AOA and ASIC. He indicated that if it was determined that no liability insurance was available to Southwest, he believed the United States would drop its claims as uncollectable. The court's files contain a memorandum of a telephone conversation of December 31, 1981 between the court and Gary Allen, attorney for the United States. Allen indicated in response to Lindberg's letter that he did not want totally to commit himself, but it was his impression that if the insurance carrier was found liable the action by the United States would not be pursued. On more than one occasion when this court attempted to set the cases for trial, it was informed by all counsel that the insurance coverage should be determined first. Whether or not the case would be tried depended on that outcome.

**16.** Rule 26(e) states the duty of a party to supplement discovery responses:

A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement his response to include information thereafter acquired, except as follows:
(1) A party is under a duty seasonably to supplement his response with respect to any question directly addressed to (a) the identity and location of persons having knowledge of discoverable matters....

(2) A party is under a duty seasonably to amend a prior response if he obtains information upon the basis of which (s) he knows that the response was incorrect when made, or (B) he knows that the response though correct when made is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment.
Fed.R.Civ.P. 26(e). The United States contends that this supplementation by Southwest was untimely and fraudulently inadequate.
Although Southwest may have failed to comply strictly with Rule 26(e), its conduct viewed as a whole does not rise to the level of fraud or other misconduct. The supplementation was made by Johnson well before the claims of the passengers were settled and the remaining claims went to trial. The supplemental response informed the United States that a statement had been taken. The statement by Johnson that he did not have a copy of the statement was inaccurate, but nevertheless did indicate that a statement was in Southwest's possession and who the individual was that had given the statement. Therefore it was clear to the United States that the detailed responses it had requested in interrogatories 7 and 8 had not been provided. If it felt entitled to receive that information, it had various means by which to pursue discovery; it simply chose not to take any action.

**17.** Local Rule 4 C requires that the parties meet and attempt to resolve their differences before the court will entertain a motion concerning interrogatories, requests for admissions or any

The United States was fully aware in November of 1980 that the statement mentioned in Johnson's supplemental response had not been provided or its contents disclosed. It knew that Southwest had provided only broad general statements in response to interrogatory 8's request for the nature of the named individuals' knowledge. Yet despite this knowledge, the United States failed to pursue the normal discovery procedures that were available for obtaining more information. If it had taken any of the available courses of inquiry, the existence of the punch would have been divulged. Its failure to do so does not make Southwest's answers fraudulent.

Southwest's response to interrogatory 16 is the United States' best evidence of possible misconduct. Unlike the responses to interrogatories 7 and 8, the answer to interrogatory 16 failed to provide any information that would lead to the discovery of the punch. It simply stated that the wreckage was "[b]elieved to be at Packer Engineering" and that none of the wreckage was under Southwest's control. The United

States argues that the punch clearly fell within the interrogatory's request for name of the custodian and the location of "each and every portion of the wreckage". Johnson asserts that in answering interrogatory 16 it was his judgment that the punch had never been a part of the aircraft wreckage any more than, say, the occupants' cigarette lighters or the contents of their briefcases or their shoes.

 The determination as to whether the answer to interrogatory 16 was fraudulent cannot be made in isolation but must be viewed in the context of the complete set of interrogatories and answers. It seems incongruous to argue that Southwest was fraudulently concealing the same information in its response to interrogatory 16 that it was openly revealing in its responses to interrogatories 7 and 8. Furthermore, even if Southwest had concluded that the punch was wreckage, its answer to interrogatory 16 would likely have provided the United States with no more information than it already possessed.[18]

other discovery matter. In addition, the United States itself failed to supplement any of its incomplete answers to Southwest's interrogatories.

**18.** It would have been proper for Southwest to narrowly construe the discovery request by the United States. *See Kerwit Medical Products v. N & H Instruments*, 616 F.2d 833, 837 (5th Cir. 1980). The duty of a party in responding to an adversary's request is to disclose all that legally must be disclosed, but no more. *Compare* Model Code of Professional Responsibility DR 7–102 *with* Model Code of Professional Responsibility DR 7–101. In carrying out this responsibility, the "well-nigh universal practice" is to construe an adversary's discovery request narrowly and to yield ground only slowly and grudgingly. *USM Corp. v. SPS Technologies, Inc.*, 694 F.2d 505, 509 (7th Cir.1982), *cert. denied*, 462 U.S. 1107, 103 S.Ct. 2455, 77 L.Ed.2d 1334 (1983).

This general approach is espoused by commentators on the discovery process including Mark Dombroff, Director of the Torts Branch of the Civil Division of the United States Department of Justice. Mr. Dombroff appeared as the United States designated witness in this action in response to a notice of deposition of the designated "employee(s), attorney(s) or agent(s) of plaintiff who are most qualified to testify" as to

the principal factual allegations in the plaintiff's complaint.

In discussing the discovery process, Dombroff states that answers to interrogatories are oftentimes drafted so as to reveal as little information as is humanly possible. Deposition of Mark A. Dombroff Exhibit 4 (1982 article published in *Law Notes* entitled Effective Discovery Techniques and Tactics Under the Federal Rules of Civil Procedure). An attorney's goal in answering interrogatories is to provide accurate answers, but to give the other side no more information than is absolutely necessary. *Id.* at Exhibit 5 (National Practice Institute presentation entitled *Trial Tactics: An Effective Approach to Winning Cases* ). An attorney should disclose what must be disclosed in a form least likely to harm the client's case. *Id.* Dombroff concludes that interrogatories can be used to their greatest benefit in conjunction with, or as preparation for, other methods of discovery. "Through interrogatories an attorney can learn of the existence, identity and location of documents and things which he or she can later request for productions or witnesses whom he or she can later depose." Deposition of Mark A. Dombroff Exhibit 4 (1982 article published in *Law Notes* entitled Effective Discovery Techniques and Tactics Under the Federal Rules of Civil Procedure).

Southwest's answer might have been framed to reveal only that "wreckage" was in the possession of Jack Beaulieu and perhaps also Walter Wermerskirchen. The names of these individuals had already been revealed to the United States, and it was also aware, based on the interrogatory answers received from Hvass on behalf of the trustees for the passengers, that not all of the wreckage was at Packer Engineering. The United States failed to take any action on this information, however. Thus, even if interrogatory 16 properly called for Southwest to indicate that it had possession of some wreckage, specifically the punch, its failure to do so does not rise to the level of fraud or other misconduct that would invoke Rule 60(b)(3) relief.

The United States seeks to rely on *Rozier v. Ford Motor Co.*, 573 F.2d 1332 (5th Cir.1978) in support of a finding of fraud. In *Rozier*, the plaintiffs were granted a new trial under Rule 60(b)(3) based upon the failure of defendant Ford Motor Company (Ford) to disclose a confidential cost engineering report in response to a discovery order that by "any fair reading" called for its production.

■ The actions of both Southwest and the United States make this case distinguishable from *Rozier*. In *Rozier* the plaintiffs had taken all possible steps to obtain the requested cost-benefit information, including a court order defining the

document request and ordering the submission of all material falling within the request. They also were totally precluded from discovering the report by Ford's failure to reveal it in response to any of the sixteen interrogatories included within the court's discovery order. In contrast, the United States completely failed to pursue the answers given it by Southwest; answers that would have provided full access to all of the information requested by the United States.[19]

The United States also asserts that the parties' misconduct is not just limited to the interrogatory answers of Southwest. It claims that the failure to include the punch with the wreckage sent to Packer Engineering was an active concealment of evidence and that this initial decision led to subsequent fraudulent acts and omissions of the parties. It cites as examples the parties' failure to reveal the punch when the expert for the United States went to Packer Engineering and inspected the wreckage and the questioning of NTSB inspector Robert Johnson without informing him of the punch.

■ These additional allegations fail to provide a basis for a finding of misconduct under Rule 60(b)(3). The duty of an adversary to disclose evidence to the opposing party absent a specific discovery request is limited. *USM Corp. v. SPS Technologies, Inc.*, 694 F.2d 505, 509 (7th Cir.

**19.** The other cases relied on by the United States also are distinguishable on the same basis. In *Seaboldt v. Pennsylvania R.R. Co.*, 290 F.2d 296 (3d Cir.1961), a new trial was granted under Rule 60(b)(3) because the deliberate misconduct of the plaintiff's attorney precluded the defendant from discovering the identity of a chiropractor who had treated the plaintiff. No such preclusion arose from Southwest's answers to interrogatories. Southwest contends that its discovery responses were proper; even assuming that they were not proper, its answers nevertheless accurately provided the United States with all of the information necessary for it to learn of the punch.

The United States' failure to seek additional information shows either a conscious decision or an oversight by a party sophisticated and experienced in the litigation process. The court may properly consider the United States conduct in its evaluation under Rule 60(b); the

government's inaction here weighs against any finding of misconduct. *See Toledo Scales Co. v. Computing Scale Co.*, 261 U.S. 399, 43 S.Ct. 458, 67 L.Ed. 719 (1923); *Bulloch v. United States*, 721 F.2d 713 (10th Cir.1984); *Manning v. Trustees*, 613 F.2d 1200 (1st Cir.1980). A critical consideration bearing on a decision whether to set aside a judgment for fraud is "whether in the original action the victim had pursued reasonable precautions against deception." *USM Corp. v. SPS Technologies, Inc.*, 694 F.2d 505, 509 (7th Cir.1982), *cert. denied*, 462 U.S. 1107, 103 S.Ct. 2455, 77 L.Ed.2d 1334 (1983) (fraud against court). "Fraud in responding to a request for discovery should mean a more active obstruction of the inquiry than simply putting opposing counsel to the burden of getting a discovery order". *Id.* Here, the United States was simply put to the burden of following up on the interrogatory answers it in fact received.

1982), *cert. denied*, 462 U.S. 1107, 103 S.Ct. 2455, 77 L.Ed.2d 1334 (1983). Of course, active concealment of evidence by a party with a duty to disclose or affirmative misrepresentations may form the basis for Rule 60(b)(3) relief. *See Seaboldt v. Pennsylvania R.R. Co.*, 290 F.2d 296, 298–300 (3d Cir.1961); *R. Mallen & V. Levitt, Legal Malpractice* § 107, p. 187 (2d Ed. 1981).

There is no evidence that the parties engaged in any of the wrongful activities that would give rise to a claim for relief under Rule 60(b)(3). The original request to have the wreckage sent to Packer Engineering was made by Charles Hvass, attorney for the passengers, and not by the United States. No duty arose to the United States at that time. The alleged concealment of the punch while the United States' expert was at Packer Engineering was not a concealment at all because the parties never represented to the United States that the complete wreckage was located there. In fact, the answers to interrogatories provided by the trustees for the passengers had informed the United States that part of the wreckage was located with Walter Wermerskirchen and part was in the custody of the NTSB, in addition to its location at Packer Engineering.[20] Also, there was no duty to reveal the punch to the NTSB investigator during the taking of his deposition since the parties learned of it long after the NTSB completed its investigation and released the remains of the airplane.

◼◼◼ The acts and/or omissions put forth by the United States do not show any affirmative misconduct, nor do they give rise to any duty to disclose the punch. While the existence of the punch would obviously have been of great interest to the United States, there was no duty to disclose beyond the specific discovery requests. *See Kerwit Medical Products v. N & H Instruments, Inc.*, 616 F.2d 833, 837 (5th Cir.1980).

◼◼◼ The court also finds that the United States is not entitled to Rule 60(b) relief because it cannot show that it was prevented from fully and fairly presenting its claims and defenses. As noted above, the United States had in its possession all the information it needed to develop the theory of causation that it now asserts it was denied an opportunity to present.[21] It was the failure of the United States to even minimally inquire into the answers received or to request additional information rather than any "misconduct" on the part of others that prevented the full and fair presentation of any additional defenses or claims. *See supra* note 19.

### III. MOTIONS FOR SUMMARY JUDGMENT

The United States in its action for fraud has named as defendants virtually all of

---

**20.** Donald Sime, the attorney for the United States at the time indicated that William Allen, the United States' expert, was sent to Packer Engineering at his request after conversations with Charles Hvass. Sime does not remember if he talked to either Dean Johnson or Michael Lindberg on the same subject or not. Sime stated that he believed Hvass had told him the wreckage was located at Packer Engineering, but he could not remember the specific conversation; he had called Hvass about having the wreckage examined and subsequently he sent Allen to Packer Engineering. He admits that he had Hvass' formal answers to interrogatories prior to any of these conversations. *See supra* note 11; Deposition of Donald Sime 97–104.

**21.** Bellows also makes the argument that the "punch" theory of causation does not aid the United States at all in its claim for contribution and indemnity against Bellows because that claim is based solely on pilot negligence. The United States has made no attempt to refute this logical argument.

Furthermore, the evidence presented at trial was very persuasive that the plane was directed into a thunderstorm, where the turbulence caused the plane to break up in the air and crash. The expert testimony of John Prodan to that effect was unrefuted at trial. The United States did not appeal the decision and to date has not made any showing through an expert witness that the punch is in any way causally related to the crash. It is relevant to both the Rule 60(b) and the summary judgment motions that the wreckage is no longer available; the evidence adduced while the wreckage was available and presented by the parties at trial overwhelmingly supported the order for judgment; and no expert testimony has been produced that would support any alternative theory of causation.

the parties involved in the prior litigation. The defendants have moved to dismiss or for summary judgment.[22] The factual background to this action arises out of the same set of facts and legal theories underlying the Rule 60(b) motion. The standard for decision is different, however.

*Discussion*

In passing upon a motion for summary judgment, the court is required to view the facts in the light most favorable to the party opposing the motion and to give that party the benefit of all reasonable inferences to be drawn from the underlying facts disclosed in pleadings and affidavits. *Ralph's Distributing Co. v. AMF, Inc.*, 667 F.2d 670 (8th Cir.1981); *Vette Co. v. Aetna Casualty & Surety Co.*, 612 F.2d 1076 (8th Cir.1980). Under Rule 56 of the Federal Rules of Civil Procedure, a motion for summary judgment may be granted only if the pleadings and affidavits show that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c). The nonmoving party may not merely rest upon the allegations or denials of the party's pleadings, but must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial. *Burst v. Adolph Coors Co.*, 650 F.2d 930, 932 (8th Cir.1981).

▆ The United States seeks to recover damages against each defendant based upon allegations of fraud. It asserts that they each played some role in the fraudulent concealment of the punch. Under Minnesota law, a person is liable for fraud:

if he makes a false representation of a past or existing material fact susceptible of knowledge, knowing it to be false, or as of his own knowledge without know-

ing whether it is true or false, with intention to induce the person to whom it is made to act in reliance upon it, or under such circumstances that such person is justified in acting in reliance upon it, and such person is thereby deceived and induced to act in reliance upon it, to his pecuniary damage.

*Swanson v. Domning*, 251 Minn. 110, 114, 86 N.W.2d 716, 720 (1957) (footnote and citation omitted); *see also, e.g., Rochester Methodist Hosp. v. Travelers Ins. Co.*, 728 F.2d 1006, 1017 (8th Cir.1984); *Western Contracting Corp. v. Dow Chemical Co.*, 664 F.2d 1097, 1100 (8th Cir.1981).

The element of reliance interfaces with two parts of the test. The defendant must have made false representations with the intention of inducing the United States to act in reliance upon them or under such circumstances that the United States would be justified in so acting. Also, the United States must be deceived and induced to act in reliance upon such false representation. This element of reliance, as well as each of the other elements, must be established in order to support a claim for fraud.[23]

▆ The court has carefully examined the record and all of the materials submitted and finds as a matter of law that, viewing the facts in the light most favorable to the United States, the element of reliance cannot be established against any of the defendants. The court's analysis in denying the United States Rule 60(b) motion is equally applicable here. The United States' failure to follow through on the interrogatory answers provided establishes that it did not act in reliance upon the omissions and misstatements it alleges were made. The interrogatory answers Southwest gave access to all the informa-

---

**22.** Because matters outside the pleadings have been submitted by the parties and considered by the court, the motions will be treated as motions for summary judgment. Fed.R.Civ.P. 12(c). Several defendants have sought to have the claims against them dismissed for failure to plead fraud with sufficient particularity. Fed.R. Civ.P. 9(b). Defendants ASIC and AOA move for dismissal under Rule 4(d)(3) based upon improper service of process. The court's ruling

on summary judgment makes it unnecessary to reach these issues.

**23.** The defendants assert that summary judgment is proper because the United States cannot establish several other necessary elements of fraud. The court's finding that, as a matter of law, the United States cannot establish reliance, makes it unnecessary to reach these other arguments.

tion the United States now claims was fraudulently withheld. The United States also cannot establish that there was any intent that it rely on misrepresentations or any circumstances justifying such reliance.

 The United States' claims against the defendants go beyond the interrogatory answers propounded by Johnson as attorney for Southwest. As with the Rule 60(b) motion, however, these interrogatory answers are the centerpiece of the claims against all defendants. Much of the alleged wrongful conduct is claimed to flow from the parties' knowledge that Southwest was fraudulently withholding information about the existence of the punch. The conclusion that these answers as a matter of law do not support a claim for fraud eliminates most of the bases for the claims asserted by the United States.

Examined in the light most favorable to the United States, the remaining allegations also fail as a matter of law to establish any claim for fraud. The parties had no duty to reveal information to the United States other than in response to specific discovery requests. *See USM Corp. v. SPS Technologies, Inc.*, 694 F.2d 505, 509 (7th Cir.1982), *cert. denied*, 462 U.S. 1107, 103 S.Ct. 2455, 77 L.Ed.2d 1334 (1983). Setting aside the interrogatories to Southwest, only Charles Hvass as attorney for the trustees of the passengers received a request that related to the wreckage. The interrogatory answers provided by Hvass informed the United States that certain portions of the wreckage were not at Packer Engineering, but with Walter Wermerskirchen and perhaps the NTSB. Any conversations between Donald Sime, the attorney for the United States, and Hvass about the location of the wreckage occurred after these answers were received by the United States. These answers were proper, and they provided the United States with yet another means of learning of the punch.

No affirmative misconduct or misrepresentation by any party has been shown.

Such a finding would be largely dependent upon a determination that Southwest's answers to interrogatories were fraudulent; then actions taken by the parties with the knowledge that the United States was entitled to information on the punch might also have been fraudulent. The court's ruling that Southwest's answers were not fraudulent precludes a finding of fraud on this basis, however. Other possible bases for fraud, such as Hvass' conversation or conversations with Sime concerning the location of the wreckage and the questioning of the NTSB investigator, were previously discussed in the context of Rule 60(b), and it was determined that no misconduct was shown. That analysis is applicable here. Even when evaluating the facts in the light most favorable to the United States, there is no basis to support a claim of fraud against any of the defendants.[24]

## IV. SANCTIONS

 The parties opposing the Rule 60(b) motion and the separate action for damages brought by the United States all seek sanctions including attorneys' fees and costs against the United States. They assert that sanctions are proper under Rule 11 because the United States' claims have no basis in law or fact and no reasonable inquiry was made prior to their being filed. Defendants Dean Johnson, Michael Lindberg and their law firm also seek similar sanctions under 28 U.S.C. § 1927 for the unreasonable and vexatious multiplication of proceedings. Such an award of attorneys' fees or other sanction is entrusted to the court's discretion. *Suslick v. Rothschild Securities Corp.*, 741 F.2d 1000 (7th Cir.1984).

 Rule 11 provides in part:
The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information and belief formed after rea-

---

**24.** The amended complaint submitted by the United States has been fully considered in passing on the motions before the court and the

court's analysis and conclusions are the same under either version of the complaint.

sonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

Fed.R.Civ.P. 11. The rule provides that if it is violated, the court shall impose sanctions which may include costs and attorneys' fees. *Id.* The rule was amended to this present form in August of 1983. The amended rule provides for a more stringent standard, and it is likely that sanctions will be imposed in an increasing number of cases. *See Advisory Committee Notes to Amended Rule 11,* reprinted in 97 F.R.D. 165, 198–99 (1983).

Courts called on to apply Rule 11 subsequent to the 1983 amendment have differed as to whether subjective or objective bad faith is necessary in order for sanctions to be imposed. *Compare Suslick v. Rothschild Securities Corp.,* 741 F.2d 1000 (7th Cir.1982) (subjective standard) *with Zaldivar v. City of Los Angeles,* 590 F.Supp. 852, 856–59 (C.D.Cal.1984) (objective standard). This court adopts the view that the appropriate standard is an objective one. This position is supported by the elimination in the 1983 amendments of the need for willfulness and the inclusion of language specifically listing the duties of the attorney before signing. A subjective standard would be contrary to the intent of the 1983 amendment to make Rule 11 a more effective measure to prevent frivolous claims or defenses. *Zaldivar v. City of Los Angeles,* 590 F.Supp. at 856; *Advisory Committee Note to Amended Rule 11,* reprinted in 97 F.R.D. at 198–99. Good faith alone is an insufficient basis for certification; there must be "some prefiling inquiry into both the facts and the law". Advisory Committee Note to Amended Rule 11, reprinted in 97 F.R.D. at 198.

■ Applying Rule 11 to the facts and circumstances of this case, the court concludes that it has not been violated. Under the objective standard, it cannot be said that the United States filings are so without factual and legal foundation that they can be considered frivolous or unreasonable. *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978); *Zaldivar v. City of Los Angeles,* 590 F.Supp. at 856–57. Prior to filing these matters, the United States obtained the affidavits of Wermerskirchen and Schroeder, both of whom had firsthand knowledge of the punch and the parties' conduct. It also had a copy of a statement given previously by Schroeder, and it had contacted Donald Sime, the attorney who had handled the case for the United States. Only after reviewing the information provided by these individuals did the United States take action.

This information and Southwest's interrogatory answers gave the United States a basis for filing its papers. The claims against the parties other than Southwest and its attorneys also were not frivolous or unreasonable because of their knowledge of the punch and Southwest's failure to reveal it and their own actions in connection with the punch.

■ The court's rulings on the merits today are not relevant to the inquiry on sanctions. A court is not to use the wisdom of hindsight but instead should inquire into what was reasonable to believe at the time the papers were submitted. *Advisory Committee Notes to Amended Rule,* reprinted in 97 F.R.D. at 200; *cf. Lotz Realty Co. v. United States Dep't of Housing and Urban Dev.,* 717 F.2d 929, 932 (4th Cir. 1983). The inquiry made by the United States gave it a sound basis in law and fact to file its papers seeking relief based on fraud; accordingly, there is no basis for the imposition of any sanctions.[25]

---

**25.** The actions of the United States also do not violate 28 U.S.C. § 1927 which imposes sanctions on an attorney for unreasonably and vexatiously multiplying the proceedings in a case. Where the alleged misconduct was, as here, the filing and arguing of a claim, it is not sufficient that the claim be found meritless; the claim must be without a plausible legal or factual basis and lacking in justification. *Knorr Brake*

## ORDER

Accordingly, based upon the above and all the files, records, and proceedings herein,

IT IS HEREBY ORDERED that

1. The motion of the United States for relief from judgment in *Rauenhorst v. United States*, 104 F.R.D. 588 (1985) and *Southwest Aircraft Leasing, Inc. v. United States*, 104 F.R.D. 588 (1985), is denied.

2. The motions of Southwest Aircraft Leasing, Inc. and Barbee Lee Bellows for sanctions against the United States in *Rauenhorst v. United States*, 104 F.R.D. 588 (1985), and *Southwest Aircraft Leasing, Inc. v. United States*, 104 F.R.D. 588 (1985) Civ. No. 4–79–562, are denied.

3. The defendants' motions for summary judgment in *United States v. Southwest Aircraft Leasing, Inc., et al.*, 104 F.R.D. 588 (1985), are granted, and the complaint is dismissed with prejudice.

4. The defendants' motions for sanctions against the United States in *United States v. Southwest Aircraft Leasing, Inc., et al.*, 104 F.R.D. 588 (1985), are denied.

5. The motion of the United States to amend the complaint in *United States v. Southwest Aircraft Leasing, Inc.*, 104 F.R.D. 588 (1985), is dismissed as moot.

*Corp. v. Harbil Inc.*, 738 F.2d 223, 226–27 (7th Cir.1984).