Edward CRESSWELL, et al., Plaintiffs,

v.

SULLIVAN & CROMWELL and Prudential–Bache Securities, Inc., Defendants.

Percy Herbert MEADOWS, Jorgen Hellzen, Chalais Holdings Limited, Elizabeth E. Noble, Ghasson Nagib Pharaon, Gerhardt Schulte–Heuthaus, and Roderick R. Von Etzdorf, Plaintiffs,

v.

SULLIVAN & CROMWELL and Prudential–Bache Securities, Inc., Defendants.

Nos. 87 Civ. 2685 (RWS), 88 Civ. 2221 (RWS).

United States District Court, S.D. New York.

Jan. 11, 1989.

nance that Saudi had received payment from Bechtel.

Cooper, Brown & Behrle, P.C., New York City, for Cresswell plaintiffs; Richard B. Cooper, James M. Latimer, of counsel.

Wachtell, Lipton, Rosen & Katz, New York City, for Sullivan & Cromwell; Bernard W. Nussbaum, Kenneth B. Forrest, Rodrigo J. Howard, of counsel.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for Prudential–Bache Securities, Inc.; Sanford M. Litvack, Charles Chasin, of counsel.

Brown & Seymour, New York City, for the Meadows plaintiffs; Whitney North Seymour, Jr., Peter Megargee Brown, of counsel.

## OPINION

SWEET, District Judge.

Defendant Prudential–Bache Securities Inc. ("Bache") has moved *in limine* to preclude the deposition and trial testimony of Edward J. Swan, Esq. ("Swan") who represented certain of the plaintiffs in *Cresswell v. Prudential–Bache Securities, Inc.*, 83 Civ. 2099 (RWS) ("*Cresswell I*") on the grounds that the contingency fee arrangement between Swan and counsel for the plaintiffs here, Richard Cooper, Esq. ("Cooper") is improper. Sullivan and Cromwell

has moved pursuant to Fed.R.Civ.P. 56 for summary judgment to dismiss the complaint in this action of Plaintiffs Edward Cresswell et al ("*Cresswell II*"). Plaintiffs have moved to further amend the Second Amended Complaint by adding a Fifth Claim for Relief against Sullivan and Cromwell. In a related case, *Meadows v. Sullivan and Cromwell and Prudential–Bache Securities, Inc.*, 88 Civ. 2221 (RWS) ("*Meadows*"), the *Meadows* plaintiffs have moved pursuant to Fed.R.Civ.P. 42(a) to consolidate their action with this one, "*Cresswell II*". Upon the reasons, facts and conclusions set forth below, Bache's motion to preclude the testimony of Swan, Plaintiffs' motion to amend the Second Amended Complaint, and the *Meadows* plaintiffs' motion to consolidate are denied, and Sullivan and Cromwell's motion for summary judgment is granted.

Briefly stated, the amended complaint alleges that Bache and Sullivan and Cromwell deliberately withheld information subject to discovery during the course of an earlier action between the *Cresswell I* plaintiffs and Bache, and that this withholding constitutes grounds for rescinding the settlement of the earlier action and for an increased award of damages which would have resulted, had the withheld information been revealed. That information related to the initiation of a proceeding by the New York Stock Exchange (the "NYSE") into Bache's activities in connection with the sale of securities which were the subject of *Cresswell I*. The propriety of the conduct of attorneys in litigation is the underlying issue in the disposition of these motions. The skill of counsel for both sides has greatly assisted in the determination of these issues which are vexing, sensitive, and by their nature particularly appropriate for resolution at this stage of the litigation.

### Prior Proceedings

The present action was commenced in April, 1987, alleging that the exchange between Bache and the NYSE in December, 1983 had been deliberately withheld. The Complaint alleged that the nonproduction of the documents caused plaintiffs to settle *Cresswell I* for less than they otherwise would have.

Certain of the prior proceedings of this case are set forth in this court's opinion of July 31, 1987, familiarity with which is assumed, which denied Sullivan and Cromwell's motion pursuant to Rule 12(b)(6) Fed. R.Civ.P. to dismiss the amended complaint. *Cresswell v. Sullivan and Cromwell*, 668 F.Supp. 166 (S.D.N.Y.1987). Discovery has proceeded in this action and has largely been completed.

On March 31, 1988, certain of the former plaintiffs in *Cresswell I* filed a separate action (*Meadows*), seeking the same relief requested by the Plaintiffs in *Cresswell II*. Although there has been little, if any, discovery in *Meadows*, aside from any discovery relating to the particular plaintiffs, this court determined in June, 1988 that plaintiffs in *Meadows* could have access to the discovery material gathered by *Cresswell II* discovery.

The Bache motion to disqualify Swan was heard on July 21, 1988, and its disposition was deferred until the disposition of the remaining motions which were heard on October 21, 1988.

### FINDINGS OF FACT

#### *The Underlying Investment*

In 1981–82, Bache recommended in Europe an investment program based upon the spread between the price of GNMA futures contracts and the price of Treasury Bond futures (the "Spreads"). Certain publications issued by Bache were alleged by all plaintiffs to have been misleading. In October, 1982, the spread widened beyond its historic position, and the plaintiffs were required to liquidate their positions, incurring losses.

#### *Cresswell I*

In March, 1983, sixty plaintiffs represented by Swan filed a complaint alleging that Bache had made materially false and misleading statements in connection with the marketing of the Spreads and seeking $2.87 million in compensatory damages and $200 million in punitive damages (*Cresswell I*). Eventually, more than 80 plaintiffs

sought $5.68 million in compensatory damages and $208 million in punitive damages.

Marvin Schwartz ("Schwartz"), a senior litigation partner at Sullivan and Cromwell, was in charge of the matter for Bache, and was assisted by Sullivan and Cromwell associates Howard Burnett ("Burnett") and John L. Hardiman ("Hardiman"). The parties in *Cresswell I* reached a settlement in early 1985 pursuant to which Bache paid the plaintiffs in *Cresswell I* and a similar case, *Wallin, et al v. Prudential–Bache Securities, Inc.*, 84 Civ. 7192 (RWS), a total of approximately $2.7 million, or 46% of the claimed dollar losses in those actions, and forgave debit amounts due from several plaintiff-customers.

*Polly Gregory Documents, the July 14 Letter and the NYSE Inquiry*

On January 6, 1983, prior to the initiation of *Cresswell I*, an investor, Polly Gregory ("Gregory"), later a plaintiff in *Cresswell I*, wrote to the NYSE complaining of losses in connection with the Spreads sold by Bache in Europe and seeking assistance in recouping her losses. Gregory's letter was referred to the NYSE Division of Member Firm Regulatory Services, where it came to the attention of a Review Specialist, Barbara Krupinski ("Krupinski"). On February 1, 1983, Krupinski forwarded Gregory's letter to Bache and requested that Bache respond to the complaint and send information to the NYSE related to the marketing of the Spreads.

On March 15, a Bache memorandum was forwarded to William Goldenblum ("Goldenblum"), a Bache lawyer in Paris, regarding "correspondence received from the New York Stock Exchange regarding ... allegations against our firm." On March 28, 1983, Goldenblum responded to Krupinski by letter. Goldenblum denied without explanation that the pamphlet marketing the Spreads was misleading. The NYSE, in turn, forwarded Goldenblum's letter to Gregory. On May 4, 1983, Goldenblum again wrote to the NYSE. On May 13, Krupinski repeated a request made by telex in late April and then asked Goldenblum by letter to send her a copy of a 1981 advertisement on the Spreads and informa-

tion concerning the advertisement. On May 26, 1983, Goldenblum sent Krupinski a copy of the advertisement. By letter of June 6, 1983, Goldenblum told Hardiman of Sullivan and Cromwell that the NYSE "has raised the question of the ad," and enclosed a copy of his file relating to Polly Gregory. On June 7, Barbara D. Salmanson ("Salmanson"), a Bache attorney specializing in commodities law, told Goldenblum that Schwartz wanted to see the ad before rendering advice.

Schwartz then helped Bache prepare a response to the NYSE inquiry on the advertisement. His draft of this letter has not been preserved. Salmanson signed the letter, approved by Schwartz, which was sent to Krupinski on June 8, 1983. A copy of the letter was also sent to Hardiman. In the letter, Bache informed the NYSE that the advertisement on the Spreads had been reviewed prior to publication in the *London Financial Times*, and that since the Bache reviewer "assumed that the brochure referred to in the advertisement was in fact available to the public," it was felt that the advertisement would not violate NYSE standards. At some time in mid 1983, Gregory's letter of complaint and the Bache responses were referred by the Regulatory Services of the NYSE to its Department of Enforcement.

On December 5, 1983, Loren Schechter ("Schechter"), General Counsel of Bache, received a letter from Donald E. Shippy ("Shippy"), a Senior Enforcement Investigator from the Department of Enforcement indicating that the Exchange was "investigating the possibility that ... Bache ... may have violated the standards for advertising and sales literature contained in ... the Exchange Rules" with regard to the advertisement and brochure on the Spreads (the "December 5 Letter"). On December 9, 1983, Schechter responded to the Exchange with a brief letter indicating that he would "look into the matter promptly and be in touch ..." (the "December 9 Letter").

On December 13, 1983 Shippy held a phone conversation with Schechter and

Salmonson. In his memorandum of that conversation, Shippy wrote:

> Pru–Bache, according to Mr. Schechter, is currently the subject to 83 suits seeking $5,000,000 in damages. Because of this civil litigation, the firm cannot take a hit because [of] this alleged rule violation and will contest us if we bring charges against them.

In January, 1984, Gregory, who had become a *Cresswell I* plaintiff in December, 1983, provided Swan with some of her correspondence with the NYSE including Goldenblum's March 28 response. In June, 1984, Burnett deposed Gregory on behalf of Sullivan and Cromwell and marked as exhibits four documents concerning the Exchange inquiry including Gregory's January 6, 1983 complaint letter and Goldenblum's March 28 response. When Burnett marked certain of the documents, he told Gregory and Swan that some of the documents had come from the files of Bache.

After Gregory was deposed, Swan asked her to send him all of her correspondence with the Exchange. After waiting almost three months, he asked her again for the Exchange communications, and then only after Sullivan and Cromwell demanded the documents by letter and finally by motion seeking to compel production. On September 19, 1984, Gregory finally sent Swan the documents.

In July 1984, Salmanson called Burnett to tell him that she was drafting a letter to the NYSE and wanted to know whether the discovery Burnett had taken in London confirmed what she intended to put in the letter. Salmanson sent the letter dated July 11, 1984 to Shippy at the NYSE Department of Enforcement (the "July 11 Letter") and sent a copy to Burnett, who sent copies to Schwartz and Hardiman. The July 11 Letter describes the brochure used in connection with the Spreads, explaining that although the brochure "did not address in detail the risks involved in interest rate future trading, the ... strategy was explained to clients in the context of futures trading." The letter also points out that investors signed the Commodities Future Trading Commission ("CFTC") mandated Risk Disclosure Statement and Bache's suitability letter, "both of which described the risk of futures trading." After the receipt of this letter, the Exchange investigation slowed down.

In August 1985, Bache and the NYSE settled the investigation by executing a Stipulation of Facts and Consent to Penalty in which Bache consented to a censure and a $5000 fine, "without admitting or denying guilt." On October 21, 1985, the NYSE issued a decision based upon the stipulation. The Exchange found that the Bache brochure did not adequately disclose the risks of investing in the Spreads.

On January 2, 1986 the Securities and Exchange Commission ("SEC") made public its findings based on the NYSE action censuring Bache. *In the Matter of Prudential–Bache Securities, Inc. et al.* On February 12, 1986, the *Wall Street Journal* reported the settlement between Bache and the NYSE.

*The Settlement of Cresswell I*

Settlement discussions in *Cresswell I* began in the summer of 1984. Sullivan and Cromwell recommended to Bache a settlement amount. In November, 1984, Swan met with the investor association in London to discuss the potential settlement offer; the offer met with approval. In a ten page letter to his clients, Swan recommended the settlement. Swan advised that the central issue in the *Cresswell I* case was not whether Bache made misleading representations about the Spreads, but whether it was reasonable for the sophisticated investors to have relied upon misstatements. This was given particular relevance since many of the investors had not read the sales literature but had invested in the Spreads after hearing oral representations by Bache employees. Nowhere in the ten-page letter did Swan mention as a factor in favor of settlement that no regulatory bodies were investigating the Spreads, or that regulatory bodies had investigated but had taken no action upon the investigation. All but two *Cresswell I* plaintiffs agreed to

settle by February, 1985.[1] Judgments were entered dismissing the actions.

*Discovery in Cresswell I*

On April 26, 1983, plaintiffs made their first document request in *Cresswell I*, seeking production of twelve categories of documents. Hardiman coordinated the search after seeking from Bache all documents relating to the Spreads in order for Sullivan and Cromwell to determine their responsiveness. On November 18, 1983, Hardiman wrote to the manager of Bache's London office requesting him to double-check his files for "anything even remotely responsive to the request." On November 22, 1983, Sullivan and Cromwell produced over 2,600 pages of documents in response to plaintiffs' request. Among the documents produced were documents indicating investigations of the Spreads by the Chicago Board of Trade ("CBOT"), the exchange in which the Spreads were traded, and by the London Department of Trade.

On December 9, 1983, plaintiffs served their second document request (the "Second Document Request" or the "Request"). Paragraph 1 of the Request called for:

> [a]ny and all documents relating to any investigation or inquiry by any exchange, regulatory agency, or governmental body (whether in the United States or abroad) relating to defendant's marketing of the GNMA/T–Bond Spread which is the subject of this action.

Hardiman sent this request to Goldenblum in Bache's Paris office on December 13, 1983.[2]

Sullivan and Cromwell responded to the Second Document Request on December 16, 1983, stating that: "[w]ithout waiving any objections Prudential–Bache will produce documents responsive to this ... request." Again, among the documents produced were documents concerning the CBOT and the London Department of Trade, but no documents relating to the

NYSE inquiry were produced on behalf of Bache. The CBOT letter, dated October 27, 1982, requested information from Bache "explaining the circumstances surrounding the trades and losses," copies of Bache literature marketing the Spreads, customers' names, account numbers and account statements.

At his deposition in connection with this litigation, Schwartz testified that in December 1983, before responding to the Second Document Request, he and Hardiman discussed whether production of documents relating to Gregory's letter to the NYSE was required. According to Schwartz, they decided that the documents did not relate to an "investigation or inquiry" by an exchange within the meaning of the Request.

Because Gregory's complaint was being handled by the Division of Member Firm Regulatory Services and not by the Department of Enforcement, Schwartz decided that production of the Polly Gregory documents was not required by the document request and that the chance that a customer complaint would lead to a Department of Enforcement investigation was remote. Krupinski of the NYSE later testified that it was "rare" for customer complaints to lead to disciplinary action, and said that only 5% of the complaints she handled even reached the stage of a recommendation to her supervisor that the Department of Enforcement investigate. In addition, Schwartz testified that he did not think "that there was any ambiguity about Swan's document request" at the time.

Hardiman, however, testified that he did not see some of the Polly Gregory documents in 1983, cannot recall others, and made no conscious decision not to produce them. As for Gregory's initial complaint letter of January 6, 1983, he testified that he knows he never saw it before 1986. Sullivan and Cromwell interpreted the Request to call for documents relating to "in-

---

1. Merana Ltd. ("Merana") and G.G. Chaplin ("Chaplin") did not settle at that time. Merana settled in September, 1986 for $300,000 plus legal fees. Chaplin tried his claim *pro se* and achieved a return of his out-of-pocket losses. *Cresswell v. Prudential–Bache Securities, Inc.,* No. 83 Civ. 2099 (S.D.N.Y., Nov. 23, 1987).

2. Hardiman believes that he also sent the Request to Salmanson, a Bache attorney in New York. In any case, the next business day after the response to the Request was served, Salmanson received a copy of the Request.

vestigations or something like an investigation which has the potential for leading to a disciplinary charge."

In addition to the Polly Gregory documents, Sullivan and Cromwell did not produce the December 5 and December 9 letters in response to the Second Document Request. No evidence has been adduced to establish that Sullivan and Cromwell was aware of those letters prior to 1986. Sullivan and Cromwell did not represent Bache in connection with the NYSE inquiry which was handled by Bache in-house lawyers. Schechter had become General Counsel of Bache in April, 1983, and shortly thereafter, informed Schwartz that regulatory and self-regulatory matters would be handled by Bache in-house. Indeed, according to Sullivan and Cromwell, neither Hardiman nor Schwartz had been directly informed by Bache of the Exchange investigation or the settlement of the investigation, even though Sullivan and Cromwell was representing Bache in connection with *Cresswell I.*

After reviewing the February 1986 Wall Street Journal article publicly disclosing the NYSE investigation, Hardiman requested from Bache all documents relating to the investigation. Salmanson sent the file to Hardiman with a letter stating: "I am sorry that I may not have kept you fully apprised of the developments therein." The file contained the December 5 and December 9 letters. According to Sullivan and Cromwell, this was the first time that the firm had seen them.

Sullivan and Cromwell also never produced for the plaintiffs the July 11, 1984 Letter. The July 11 Letter was created seven months after the Second Document Request, and, according to Schwartz and Hardiman, no Sullivan and Cromwell lawyer focused on the Document Request in connection with the letter. Schwartz testified that although the address on the letter made it clear as of July 1984 that the Department of Enforcement of the Exchange was investigating the Spreads, Schwartz does not recall reading the letter, but assumes that he did. Apart from the fact that it was addressed to the Department of Enforcement, the July 11 Letter does not imply that an Exchange investigation had been undertaken as of December, 1983.

Following the Gregory deposition, Swan made no inquiry of Sullivan and Cromwell concerning the NYSE document which had not been produced. He also made no inquiries of the NYSE and the CBOT, the CFTC or the London Board of Trade.

*Other Documents*

In addition to the Polly Gregory documents, the December 5 and 9 letters and the July 11 letter, plaintiffs have alleged fraudulent failure to produce a publicly reported opinion, *Kotz v. Bache Halsey Stuart, Inc.,* 685 F.2d 1204 (9th Cir.1982), a decision argued by Schwartz,[3] in response to the second paragraph the Second Document Request which requested "findings, decisions, orders or conclusions of law resulting from any investigation, inquiry, lawsuit, arbitration, mediation or reparations or enforcement proceeding ... which find or state that ... [Bache] engaged in fraud or misrepresentation...." Plaintiffs also allege that Sullivan and Cromwell failed to produce other responsive reported decisions.[4] In addition, plaintiffs allege that a CBOT letter announcing that an investigation into the Spreads had been terminated upon a determination that no Rule violations had occurred was not produced, nor was a summary of a meeting with the London Department of Trade concerning the Spreads.

---

**3.** Sullivan and Cromwell points out that the *Kotz* decision was obviously known to plaintiffs, for it was the principal case cited to Swan in a research memorandum prepared by his associate during *Cresswell I.*

**4.** As examples of these omissions, plaintiffs cite *Poplar Grove Planting and Refining Co., Inc. v. Bache Halsey Stuart, Inc.,* 465 F.Supp. 585 (M.D.

La., 1979); *Commercial Iron & Metal Co. v. Bache Halsey Stuart, Inc.,* 581 F.2d 246 (10th Cir.1978); *Newman v. Bache Halsey Stuart Shields, Inc.,* C.F.T.C., 1983, CCH ¶ 21,811, and the lower court decision in *Knieriemen v. Bache Halsey Stuart Shields Inc.,* 74 A.D.2d 290, 427 N.Y.S.2d 10 (2d Dep't 1980).

### Discovery in Merana and Reitz

Merana, one of the *Cresswell I* plaintiffs declined to settle and pursued its claim represented by Andrew Berger, Esq. ("Berger"). On February 12, 1986, the day of the Wall Street Journal article concerning the SEC action, Berger called Hardiman and demanded production of all documents, a demand on which argument was heard on March 14, 1986. In March, Hardiman conducted a search of Sullivan and Cromwell's files, but did not locate the Polly Gregory documents. Hardiman later gave the file, including the December letters, to Berger, who gave it to Swan. The file included the letters of December 5 and December 9, documents reflecting the NYSE investigation and settlement, and some of the Polly Gregory documents. The entire Polly Gregory file kept at Bache was not produced by Sullivan and Cromwell until February 1988 in this proceeding.

Schwartz testified that he never thought about producing the letters, or about F.R. Civ.P. 26(e) which requires that a party amend a prior response to a request for discovery if the party obtains information upon the basis of which it knows that the response was incorrect when made. Sullivan and Cromwell thus did not produce any more documents than it had produced in *Cresswell I.*

On April 4, 1986, Swan wrote to Hardiman complaining that the December 5 and 9 letters had not been produced in *Cresswell I.* Swan's letter made no mention of the Polly Gregory documents which had started the investigation. Swan requested an additional settlement amount from Schwartz, who refused, disagreeing that additional compensation was owing to plaintiffs.

In 1986, Swan also represented another plaintiff who had participated in the Spreads in *Reitz et ano. v. Bache,* 86 Civ. 4191 (RWS) ("*Reitz*") and served the same document demand. On July 25, 1986, Sulli-

van and Cromwell responded that all documents had been produced, although such was not the case.[5]

### Later Settlements

In July, 1986, seventeen months after the settlement of *Cresswell I* and ten months after the NYSE censured Bache, Merana settled with Bache for 93.99% of the claimed losses, a greater percentage of the claim than it had paid to the plaintiffs in *Cresswell I.* The plaintiffs in *Reitz* settled their claims in January 1987 for 71% of the claimed losses, also a greater percentage recovery than Swan had obtained for the *Cresswell I* plaintiffs.

### The Present Role of Swan

The day before Swan was deposed in this action, Sullivan and Cromwell and Bache learned that at least eight months earlier, Swan entered into an agreement with counsel for the plaintiffs in *Cresswell II* pursuant to which Swan would share in the contingency fee agreed upon with the plaintiffs in *Cresswell II* (the "Swan Agreement"). Under the Swan Agreement, Swan undertook to "waive and assign" to the plaintiffs in *Cresswell II* any claims against Sullivan and Cromwell and Bache arising out of his representation in *Cresswell I,* and to perform legal work in connection with *Cresswell II,* and to testify as a witness for the plaintiffs with respect to the facts of the conduct of Sullivan and Cromwell and Bache and its effect on the plaintiffs. In return, the plaintiffs will pay Swan one-sixth of the contingency fee to be received by Cooper in the action, and, on account, one-third of retainer payments held in non-segregated accounts by counsel to the plaintiffs. One-half of the amount to be paid to Swan is allocated in his waiver and assignment to the current plaintiffs of any claim he might have to a fee arising from his representation in *Cresswell I.* The other half is for work in connection with this action. The Swan Agreement includes a paragraph which states:

**5.** By this time Sullivan and Cromwell had obtained Bache and NYSE documents by subpoena of the Exchange in *Merana.* These documents were arguably not subject to production in *Reitz* by virtue of work product privilege which, however, was not claimed. Certainly the NYSE documents put Sullivan and Cromwell on notice that the earlier production in *Cresswell I* was inadequate.

If, despite our analysis of the propriety of what we are doing, we should hereafter see that this arrangement is somehow improper, or if a court should so hold, then anything above notwithstanding, [Swan's] entitlement to payment will be reduced or modified in order to achieve complete propriety and, to the extent possible, to be fair to [Swan].

## CONCLUSIONS

### The Code of Professional Responsibility: Rule 5–101(B) and Rule 7–109(C)

█ The Bache motion raises the issue as to whether Swan's deposition and anticipated trial testimony violate Disciplinary Rules 5–101(B) and 7–109(C) of the Code of Professional Responsibility of the American Bar Association. As has been previously stated, "the application of the Code is a part of the court's general supervisory authority to ensure fairness to all who bring their cause to the judiciary for resolution." *Freschi v. Grand Coal Venture*, 564 F.Supp. 414, 417 (S.D.N.Y.1983) (Sweet, J.) (citations omitted). Further, although "this court is not under a statutory duty to apply the Code as enacted by the American Bar Association," *United States v. Perlmutter*, 637 F.Supp. 1134, 1137 (S.D.N.Y. 1986) (Sweet, J.) (citing *International Electronics Corp. v. Flanzer*, 527 F.2d 1288, 1293 (2d Cir.1975)), the Code has been adopted by the State Bar Association of New York and its canons are recognized as appropriate guidelines for the professional conduct of New York lawyers. *See Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386 (2d Cir.1976); *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 227, n. 2 (2d Cir.1977); *NCK Organization Ltd. v. Bregman*, 542 F.2d 128, 129 n. 2 (2d Cir.1976).

Rule 5–101(B) of the Code provides:

A lawyer shall not accept employment in contemplated or pending litigation if he knows or it is obvious that he ... ought to be called as a witness, except that he

may undertake the employment and he ... may testify:

(1) If the testimony will relate solely to an uncontested matter.

(2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.

(3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client.

(4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case.

Because the Swan Agreement specifies that one-half of the contingency fee is for legal work performed by Swan, Rule 5–101(B) applies.[6] *See, e.g., Hoerger v. Board of Education*, 129 A.D.2d 659, 660–61, 514 N.Y.S.2d 402, 403–04 (2d Dept. 1987); *Hempstead Bank v. Reliance Mortgage Corp.*, 81 A.D.2d 906, 906, 439 N.Y.S. 2d 202, 203 (2d Dept.1981); *North Shore Neurosurgical Group v. Leivy*, 72 A.D.2d 598, 598–99, 421 N.Y.S.2d 100, 101–02 (2d Dept.1979).

The first three exceptions to the prohibitions of 5–101(B) are not relevant here. Swan relies on exception (4) to justify his arrangement with counsel for the plaintiffs, claiming that because of his lengthy relationship with *Cresswell I*, he has developed an extensive, unique knowledge of that case as well as additional expertise in commodities law, rendering him of "distinctive value" in *Cresswell II*. Swan cites *Lumbard v. Maglia, Inc.* for the proposition that the application of the exception in DR 5–101(B)(4) makes disqualification of a lawyer unnecessary where disqualification would "work a substantial hardship" on the plaintiff. 621 F.Supp. 1529, 1540 (S.D.N.Y. 1985). *See also Warner Bros, Inc. v. Dae Rim Trading, Inc.*, Slip Op. 84 Civ. 4675 (IBW) (S.D.N.Y. Mar. 19, 1987) [1987 WL

---

**6.** Although Swan claims that part of his fee is for legal work on *Cresswell II*, deposition testimony of several plaintiffs in this case indicates that they do not consider Swan to be their attorney. Indeed, in a letter to his former clients, Swan himself noted that he could not be their attorney in *Cresswell II* because he would be a witness and a party in the new case.

8341] (the court refused to disqualify attorney where actions had been pending more than two and a half years and the work of present counsel was extensive, and where considerable delay and expense would be required for new counsel to take over).

According to Bache, however, Swan has no "distinctive value" to this case except as plaintiffs' central fact witness. It claims that there is nothing so distinctive about the law or facts in this case that Swan's absence as an attorney would result in significant hardship to plaintiffs, and points out that both the attorneys for defendants and present counsel for the plaintiffs have been able to acquire enough knowledge of this case to represent their clients.

In addition to exception (4) of 5–101(B), the plaintiffs urge that DR 5–101(B) is no longer applicable, and that the narrower Rule 3.7 of the newer ABA Model Rules, adopted by the ABA in 1983, should apply where 5–101(B) was once used. According to Rule 3.7, "[a] lawyer shall not *act as advocate* at a trial in which the lawyer is likely to be a necessary witness ..." (emphasis added). Because the Swan Agreement provides that Swan will not perform services at trial (apart from his role as witness), plaintiffs contend that Swan is within the bounds of Rule 3.7. While it might be true that Rule 3.7 is not violated by the Swan Agreement, New York still follows DR 5–101(B).[7] To the extent that Swan is performing legal services for *Cresswell II* plaintiffs, Swan's role as an attorney and witness violates Rule 5–101(B).

Even if Swan is not in violation of DR 5–101(B), Swan's testimony in *Cresswell II* puts him in violation of Disciplinary Rule 7–109(C) of the Code of Professional Responsibility, which states that:

A lawyer shall not pay, offer to pay, or acquiesce in the payment of compensation to a witness contingent upon the content of his testimony or the outcome of the case.

The rationale for this rule is found in Ethical Consideration 7–28:

Witnesses should always testify truthfully and should be free from any financial inducements that might tempt them to do otherwise. A lawyer should not pay or agree to pay a nonexpert witness an amount in excess of reimbursement for expenses and financial loss incident to his being a witness; however, a lawyer may pay or agree to pay an expert witness a reasonable fee for his services as an expert. *But in no event should a lawyer pay or agree to pay a contingent fee to any witness.*

(Emphasis added)

Swan has admitted that, pursuant to the Swan Agreement, his payment in this case will be "contingent to a substantial extent" upon the outcome of the case and that he is a central fact witness for plaintiffs. Thus, his testimony is in direct conflict with Rule 7–109(C).

Case law confirms that witnesses should not be paid on a contingency basis. In *Person v. Association of the Bar of the City of New York,* the Court of Appeals for the Second Circuit explained that Rule 7–109(C) has been incorporated into the laws of New York and reflects a legislative judgment of "the need for discouragement of contingent fee arrangements." 554 F.2d 534, 538 (2d Cir.1977). The Court continued: "[d]isciplinary Rule 7–109 C was promulgated to insure that judicial proceedings in New York were free of false testimony which might result if expert witnesses were paid on a contingent fee basis." 554 F.2d 534, 538. More recently, in *Cosgrove v. Sears Roebuck and Co.,* this Court held that where an expert witness was to receive payment only if plaintiff won the case, Rule 7–109 was violated, for the fee arrangement was "contingent on its face." The testimony of the expert witness was thus precluded. No. 81 Civ. 3482 (CSH) (S.D.N.Y. Dec. 16, 1987) [1987 WL 33595] [1987 U.S. Dist. LEXIS 11696].

Opinions of the New York City and New York State Bar Associations have also supported this rule against contingency payments. *See, e.g.,* NYC Bar Assn. Op. No.

---

**7.** The New York State Bar Association has never adopted the ABA Model Rules.

76 (1927–28) ("[a]n agreement to pay a witness compensation measured by the result of his testimony [i.e. contingent upon the result of the litigation] is a temptation to perjury and should be avoided); NYC Bar Assn. Op. No. 553 (1940) (where two attorneys have become aware that payment of a fee owing to them by a former client is contingent upon the outcome of a new suit in which the attorneys are not the lawyers, they must not testify in the former client's suit except under subpoena or court order); NYS Bar Assn. Op. No. 547 (1982) (warning against the possibility of obtaining falsely colored testimony in return for payment). *But see* No. 10575, 1980 Supp. to Digest of Bar Assn. Ethics Ops. (assuming the ethical propriety of a trial counsel testifying on behalf of a client, it is not improper that representation be on a contingent fee basis).

Plaintiffs have cited an Informal Opinion of the Los Angeles County Bar Association, No. 1972–1, to show that contingency fees for attorney witnesses are not always improper. The Association said that where the attorney has already made a determination that despite the possibility that he will be called to testify as a witness on behalf of his client, circumstances require him to undertake the representation of his client, a contingent-fee arrangement is not improper. However, there has been no determination that Swan is so important to this case that he has to take on the employment. In addition, the Informal Opinion, even if relevant, is not controlling here.

Thus, whether or not Swan is performing legal services for the plaintiffs, payment contingent upon the outcome of this case violates Rule 7–109(C) which prohibits contingent fees for witnesses.[8]

*The Antecedent Interest Exception*

■ Even if the Swan Agreement violates Rule 7–109(C) of the Code of Professional Responsibility, plaintiffs claim that the Rule should not be applied to Swan because he had an antecedent interest in this action—a claim for interference with economic advantages he would have realized in *Cresswell I* but for the fraud alleged, which he traded in for the contingency fee. They cite New York decisional law, *Wellington v. Kelly*, 84 N.Y. 543 (1881), to sanction a contingent fee arrangement with a witness who is possessed of an antecedent interest. In *Wellington*, Hill had paid a certain mortgage and received a satisfaction piece. Thereafter, he entered into an agreement with persons exposed to foreclosure of the mortgage, pursuant to which he would furnish papers and documents necessary to defeat the foreclosure action in return for a contingent fee equal to one-half the amount of the mortgage. Hill's assignee sued to recover upon this contingent fee. According to the court:

> Hill was not a stranger in interest to the subject of this litigation. His antecedent relation to the mortgage made it just that he should be indemnified.... The mere fact that the [contingency fee] agreement might furnish a temptation to Hill to prevaricate, or furnish false testimony does not ... stamp the agreement as illegal *per se*, and no illegal or improper intent on the part of any of the parties, is disclosed by the evidence.

*Wellington,* however, is not only an antique, it is not dispositive. Hill's antecedent interest in *Wellington* is not comparable to Swan's, whose interest, as an attorney, did not exist separate from the interest of the *Cresswell I* plaintiffs. Moreover, when *Wellington* was decided, Rule 7–109(C) of the Code of Professional Responsibility did not exist. Further, in *Wellington,* it is a question of certified copies of documents that is at issue, and not testimony. Finally, Swan's antecedent interest in this case is entirely conditional

---

**8.** Plaintiffs argue that the ABA Model Code was replaced in 1983 by the ABA Model Rules, so that DR 7–109(C) no longer applies. However, as seen, the New York State Bar Association has never adopted the ABA Model Rules, *supra,* at n. 7, and thus 7–109(C) is still law in New York. But even if the Model Rules *were* law in this jurisdiction, payment of a contingency fee to Swan would still violate the new Rule, for 3.4(B) provides: "[a] lawyer shall not ... offer an inducement to a witness that is prohibited by law." Here, case law prohibits contingency fees to witnesses.

and has not been established either as to amount or eventuality.

To establish Swan's antecedent claim, the plaintiffs claim first that an agent who contemplates benefits under a contract may claim against a third party who interferes by fraudulent means, and second, that defendants were liable to Swan under the *Ultramares* principles governing liability for fraud. *See Ultramares Corp. v. Touche, Niven & Co.*, 255 N.Y. 170, 174 N.E. 441 (1931) (Cardozo, J.).

To support the first contention, plaintiffs cite *Lurie v. New Amsterdam*, 270 N.Y. 379, 1 N.E.2d 472 (1936) and *Hornstein v. Podwitz*, 254 N.Y. 443, 173 N.E. 674 (1930). However, in those cases, the action was against third parties who induced a principal to breach a contract with the agent thus depriving the agent of monies due from the principal, whereas in this case, the principals—the *Cresswell I* clients—paid Swan his fee in full for his *Cresswell I* work. Thus, the cases supporting the first theory do not apply here.

The *Ultramares* principle also does not apply, despite its holding that a plaintiff can sue defendant for fraud even where no privity exists. *Ultramares*, 255 N.Y. 170, 174 N.E. 441. *See also State Street Trust Co. v. Ernst*, 278 N.Y. 104, 112, 15 N.E.2d 416, *reh'g denied*, 278 N.Y. 704, 16 N.E.2d 851 (1938) (accountants are liable to parties not in privity because "heedlessness and reckless disregard of consequence may take the place of deliberate intention"); *Peerless Mills, Inc. v. American Telephone & Telegraph Company*, 527 F.2d 445, 450 (2d Cir.1975) ("[a] third party can recover damages for a fraudulent misrepresentation if he can establish that he relied upon it to his detriment, and that the defendants intended the misrepresentation to be conveyed to him") (footnote omitted); *Berkowitz v. Baron*, 428 F.Supp. 1190, 1196 (S.D.N.Y.1977) ("plaintiffs must prove that Markowe knowingly made false representations of material fact with the intent to deceive investors and induce them to

rely thereon, and that plaintiffs did rely on the representations to their detriment"); *American Electric Power Company, Inc. v. Westinghouse Electric Corporation*, 418 F.Supp. 435, 450 (S.D.N.Y.1976) (a plaintiff may recover for defendant's alleged fraudulent misrepresentations upon a showing that plaintiff was within the class of persons whom the defendant should reasonably have expected would rely on the statements, and where the plaintiff in fact relied); Restatement of Torts, Second, § 531 ("[o]ne who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or refrain from action in reliance upon the misrepresentation. . . .").

Although Bache and Sullivan and Cromwell might well have expected Swan's reliance on their alleged misrepresentations, and because Swan is alleged to have relied on them, Swan may have an independent fraud claim pursuant to *Ultramares* if it is established that but for the fraud, a greater recovery and consequently a greater fee would have been received. As set forth below, such is not the case.

Thus, Swan has no antecedent interest in this case. Any reliance by him on defendants' statements was only in his capacity as plaintiffs' agent, and his independent claim against defendants, if any, is not antecedent.[9]

*CPLR § 4512*

■ Even if the antecedent interest exception fails, plaintiffs argue that the Rule 601 of the Federal Rules of Evidence and New York CPLR § 4512 support their contention that Swan's fee is not improper. According to Rule 601, state law determines whether an individual can be a witness in a state law claim. The relevant New York law is CPLR 4512, which states:

> [e]xcept as otherwise expressly prescribed, a person shall not be excluded or excused from being a witness, by reason of his interest in the event or because he is a party. . . .

**9.** If *Cresswell I* plaintiffs recover additional sums in this case, Swan might have an action in contract against them.

Thus, plaintiffs contend, Swan's contingent fee arrangement is not prohibited.

However, as seen, Rule 7–109(C) "expressly prescribes" a person from testifying as a witness when he or she has a contingent interest in the outcome of the case. *See Person v. Association of the Bar of the City of New York,* 554 F.2d 534, 536, 538 (2d Cir.), *cert. denied,* 434 U.S. 924, 98 S.Ct. 403, 54 L.Ed.2d 282 (1977). Further, as part of the ABA Code of Professional Responsibility, Rule 7–109(C) has been recognized in New York "as providing appropriate guidelines for proper professional behavior." *Fund of Funds v. Arthur Andersen & Co.,* 567 F.2d at 227 n. 2, citing *NCK Organization, Ltd. v. Bregman,* 542 F.2d at 129 n. 2. Thus, the payment to Swan of a contingency fee is improper. While it is true, as plaintiffs argue, that "[t]he code provisions cannot be applied as if they were controlling statutory or decisional law," Rule 7–109(C) will be applied here in the absence of conflicting authority.

*Invalidation of the Swan Agreement*

■ The conclusion that the Swan Agreement is improper presents four alternatives: (1) dismissal of the case, (2) disqualification of Swan and/or Cooper as counsel to plaintiffs in this action, (3) preclusion of Swan's testimony, and (4) invalidation of the Swan Agreement. Bache does not request dismissal, but instead urges that Swan's testimony be precluded, and cites *Cosgrove v. Sears Roebuck and Co., supra,* for the proposition that testimony should be excluded when Rule 7–109(C) has been violated. *Cosgrove,* however, is distinguishable on the grounds that the court precluded the testimony of an expert witness, where the only injury to the opposing party was the delay which it would take to hire a new expert.

Bache also cites *In re Mushroom Transp. Co., Inc.,* 70 B.R. 416, 70 Bankr.L. Rep. 416 (Bankr.E.D.Pa.1987), in which the Court barred the testimony of an individual who was hired to assist the debtor in the collection of sums in return for a court-approved contingency fee. However, in *Mushroom,* the Court relied primarily on Pennsylvania law to exclude the testimony, although it did make reference to Rule 7–109(C).

Swan and counsel to the plaintiffs have already considered the possibility that their agreement will be held unethical. The Swan Agreement provides that if the arrangement is held improper, Swan's entitlement to payment will be reduced or modified. However, Bache and Sullivan and Cromwell claim that it is too late to use this provision in the Agreement. Because defendants have already taken Swan's deposition and because "Swan's deposition testimony, to which he will undoubtedly adhere at trial, is indelibly tainted by the strong financial inducement he has been given to support plaintiff's claims," they contend that preclusion of his testimony is the only solution. Of course, Swan's credibility, fee or no, will certainly be at issue if his testimony is permitted.

The principal difficulty is that Swan's testimony on the facts provides direct evidence as to the conduct of the defendants. If motions to disqualify attorneys require "judicial scrutiny to prevent literalism from ... overcoming substantial justice to parties," *J.P. Foley & Co., Inc. v. Vanderbilt,* 523 F.2d 1357, 1360 (2d Cir.1975) (Gurfein J. concurring), quoted in *Norman Norrell, Inc. v. Federated Department Stores, Inc.,* 450 F.Supp. 127, 130 (S.D.N.Y.1978), such scrutiny is especially necessary here, where an effort has been made to preclude critical fact testimony. Substantial justice requires the testimony.

However, as long as Swan will be a central witness in this case, he cannot provide legal services to *Cresswell II* plaintiffs. Although it is unusual to disqualify a lawyer-witness who is limiting services to out-of-court assistance, *see e.g., Bottaro v. Hatton Associates,* 680 F.2d 895 (2d Cir. 1982); *Norman Norell, Inc. v. Federated Department Stores,* 450 F.Supp. 127 (S.D. N.Y.1978); *Ross v. Warthen,* No. 84 Civ. 4009 (CSH) (S.D.N.Y. Feb. 11, 1987), [1987 WL 7025] 1987 U.S. Dist. LEXIS 1078, Swan will be a key fact witness here. His work on the case raises the "threat of tainting the trial." *Bottaro,* 680 F.2d at

896. Further, in order not to run afoul of the terms of Rule 7–109(C), the Swan Agreement must be invalidated in its entirety. Because it is necessary to "avoid even the appearance of impropriety," Code of Professional Responsibility, Canon 9, and because no particular hardship to plaintiffs will be caused by Swan's disqualification if he is permitted to testify, Swan must not serve as plaintiffs' attorney, and cannot receive a contingent fee in this action.

*The Propriety of Summary Judgment*

An appropriate grant of summary judgment requires the absence of any material issue of fact. In making this determination, all inferences and ambiguities must be resolved in favor of the opposing party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, "the mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 11–12 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987) (quoting *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985) (*per curiam*)).

The elements of the plaintiffs' claim, common law fraud, are well understood: "a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970–71 (2d Cir.1987) (citations omitted). Essentially, these elements can be reduced to three here: (1) whether Sullivan and Cromwell intended to defraud plaintiffs by withholding documents; (2) whether the representation that Sullivan and Cromwell produced all documents responsive to the second document request had a material detrimental impact on plaintiffs; and (3) whether the plaintiffs relied on Sullivan and Cromwell's misrepresentation to their detriment. The standard for proving each element is clear and convincing evidence. *Ajax Hardware Mfg. Corp. v. Industrial Plants Corp.*, 569 F.2d 181, 186 (2d Cir.1977); *Lester v. Pickwick International, Inc.*, 528 F.Supp. 1011,

1013 (E.D.N.Y.1981); *Simcuski v. Saeli*, 44 N.Y.2d 442, 452–53, 377 N.E.2d 713, 718–19, 406 N.Y.S.2d 259, 265 (1978); *Manchel v. Kasdan*, 286 A.D. 483, 484, 144 N.Y.S.2d 694, 695 (1st Dept.1955), *aff'd*, 1 N.Y.2d 734, 134 N.E.2d 687, 151 N.Y.S.2d 940 (1956).

Therefore, this court must inquire "as to ... whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Anderson v. Liberty Lobby*, 477 U.S. at 255–56, 106 S.Ct. at 2514. If plaintiffs cannot meet their burden as to even one element of their claim, summary judgment for Sullivan and Cromwell must be granted. *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 295–96 (2d Cir.1986); *Seven Star Shoe Co., Inc. v. Strictly Goodies, Inc.*, 657 F.Supp. 917, 920 (S.D.N.Y.1987).

In these circumstances the principal underlying issue is the responsibility of lawyers in pretrial discovery, the effect of that conduct on the opposing counsel, and the mechanics by which securities claims are settled. It is this aspect of the controversy which makes it particularly appropriate for judicial rather than jury determination, providing, of course, there is no material fact at issue that would provide, if determined in favor of the plaintiffs, clear and convincing evidence of fraud by Sullivan and Cromwell.

*Intent*

To defeat a motion for summary judgment bottomed on lack of intent, plaintiffs must adduce clear and convincing evidence that a material issue of fact exists as to whether Sullivan and Cromwell intended to defraud the plaintiffs by failing to comply with discovery demands and withholding documents responsive to Swan's Second Document Request. It is not enough for plaintiffs to establish simply that documents responsive to the demand were not produced. *See, e.g., Perma Research and Development Co. v. Singer Co.*, 410 F.2d 572, 576 (2d Cir.1969) ("actionable fraud depends on more than a showing of nonperformance"); *DiRose v. PK Management Corp.*, 691 F.2d 628, 632–33 (2d Cir.

1982), *cert. denied,* 461 U.S. 915, 103 S.Ct. 1896, 77 L.Ed.2d 285 (1983), *quoting Lanzi v. Brooks,* 54 A.D.2d 1057, 388 N.Y.S.2d 946 (3d Dep't 1976), *aff'd* 43 N.Y.2d 778, 373 N.E.2d 278, 402 N.Y.S.2d 384 (1977) ("[u]nder New York law, any inference drawn from the fact that the expectation did not occur is not sufficient to sustain the plaintiff's burden of showing that the defendant falsely stated his intentions"); *Lang v. Warner,* 121 A.D.2d 514, 504 N.Y. S.2d 18, 19 (2d Dept 1986) ([w]here complaint did not contain factual assertions from which a conclusion of intent could be drawn, complaint failed to state a cause of action in fraud).

■ The issue of intent in a fraud case is rarely susceptible of direct proof. Therefore, fraud ordinarily must be established by circumstantial evidence "and the legitimate inferences arising therefrom." *Goshen Litho Inc. v. Kohls,* 582 F.Supp. 1561, 1564 (S.D.N.Y.1983). *See also, Rea v. Missouri,* 84 U.S. (17 Wall.) 532, 543, 21 L.Ed. 707 (1873) ("[t]o establish fraud, it is not necessary to prove it by direct and positive evidence. Circumstantial evidence is not only sufficient, but in most cases it is the only proof that can be adduced"); *United States v. Panza,* 750 F.2d 1141, 1149 (2d Cir.1984) (fraudulent intent is often established by circumstantial evidence).

According to the plaintiffs, the circumstances of the failure to produce the December 5 and December 9 letters, the Polly Gregory documents, the letter of July 11, the CBOT letter announcing the end of its investigation, the summary of the meeting with the London Department of Trade, the *Kotz* decision and other reported decisions raise an issue of material fact as to Sullivan and Cromwell's intent.

There is no evidence that Sullivan and Cromwell knew about the December 5 letter from the NYSE Enforcement Investigator and the December 9 letter in which Bache acknowledged receipt of the December 5 letter, or acquired any knowledge of the investigation until after *Cresswell I* was settled. Plaintiffs' contention that a jury could infer Sullivan and Cromwell's knowledge of the NYSE investigation from Sullivan & Cromwell's many phone calls to Bache during the relevant time period is mere speculation. *See H.L. Moore Drug Exchange v. Eli Lilly & Co.,* 662 F.2d 935, 941 (2d Cir.1981), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982), *quoting Oreck Corp. v. Whirlpool Corp.,* 639 F.2d 75, 79 (2d Cir.1980), *cert. denied,* 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981) (showing of close relations or frequent meetings between alleged conspirators cannot sustain plaintiff's burden to prove conspiracy). Apparently, Bache's policy that all information concerning the Spreads would be handled in-house prevented Sullivan and Cromwell from receiving copies of all of the letters. Indeed, the General Counsel of Bache testified that he does not recall thinking it advisable to inform Sullivan and Cromwell of the December 5 letter.

There is a material question of fact, however, as to whether intent can be inferred from Sullivan and Cromwell's narrow interpretation of the discovery request and the subsequent failure to turn over the Polly Gregory documents. Having conferred with Salmanson, Schwartz was well aware of the Bache response of June 8, 1983. It is conceded that the documents related to this stage of the NYSE investigation were in Sullivan and Cromwell's files (Plaintiff's Mem. of Facts at 28). Sullivan and Cromwell argues that Schwartz's withholding of the earlier documents was a conscious decision based upon a permissible interpretation of the discovery request. *See, e.g., USM Corp. v. SPS Technologies, Inc.,* 694 F.2d 505, 509 (7th Cir.1982), *cert. denied,* 462 U.S. 1107, 103 S.Ct. 2455, 77 L.Ed.2d 1334 (1983) (condoning the "well-nigh universal practice" of construing an adversary's discovery request narrowly); *Rauenhorst v. United States,* 104 F.R.D. 588, 600 n. 18 (D.Minn.1985) (indicating that narrowly construing a discovery request would have been proper). However, Schwartz's interpretation of "inquiry or investigation" is not in accord with its ordinary meaning, and, in the particular context of this case, could raise an inference of intent to withhold documents fraudulently, especially where the documents were not

produced even after the NYSE action became public. In addition, the inconsistency between the explanation of Schwartz and Hardiman as to the consciousness of the decision not to produce the Polly Gregory documents raises an issue of fact as to whether there was a conscious decision to withhold on a basis other than that now urged by Schwartz.

Sullivan and Cromwell contends that its actions belie fraudulent intent, because Burnett, marked several of the Polly Gregory documents at her deposition, questioned her about them and specifically stated that the documents came from Sullivan and Cromwell's files. Some had not been included in the response to the Second Document Request. Sullivan and Cromwell requested production of additional documents from Gregory and followed up on the request by letter and finally by motion in order to compel production of the documents. Although Sullivan and Cromwell's acts in the spring of 1984 constitute a compelling refutation of a consistent intent to defraud, they do not remove a question of fact as to whether a responsive document was intentionally withheld in December 1983.

As for the July 11, 1984 letter from Bache to the Exchange, plaintiffs contend that the letter, which was addressed to the Department of Enforcement, proves that Schwartz knew of the existence of the investigation, and thus knew that his earlier interpretation was incorrect and that his December 1983 representation to *Cresswell I* plaintiffs was false. Additionally, plaintiffs claim that because Sullivan and Cromwell knew of the Exchange investigation before *Cresswell I* settled and did not disclose it, and because Sullivan and Cromwell's representation had been that all responsive documents were produced, a jury could infer intent. Drawing all inferences on behalf of plaintiff, a question of fact exists as to whether Sullivan and Cromwell intended to defraud the plaintiffs in *Cresswell II* by withholding the July 11, 1984 Letter in hopes of achieving a settlement before the results of the inquiry became known, which is, of course, what happened.

Although Fed.R.Civ.P. 26(e) provides that there is generally "no duty to supplement" a discovery response in the absence of an "order of the court, agreement of the parties, or ... new requests for supplementation," Fed.R.Civ.P. 26(e) and (e)(3), and although there was no such instruction included in the Second Request in *Cresswell I* or in the litigation against Bache, by July 1984 Sullivan and Cromwell knew that even under its own narrow interpretation of the Second Document Request its earlier response was inaccurate or incomplete. A duty to amend the response at that point existed. *See* Fed.R.Civ.P. 26(e) & Advisory Committee Note thereto; *Petroleum Ins. Agency, Inc. v. Hartford Accident & Indem. Co.*, 106 F.R.D. 59 (D.Mass.1985).

In addition, the failure of Sullivan and Cromwell to produce the NYSE documents in the *Merana* and the *Reitz* cases, Hardiman's inability to locate the documents in March of 1986, the absence of Schwartz's draft of the June 8, 1983 Salmanson letter, and the later concession that the documents were in Sullivan and Cromwell's possession all fortify the inference of intentional withholding. While the *Reitz* response might have been subject to a work product privilege, documents responsive to the demand were known and withheld, and no such privilege was asserted.

As for other documents, Sullivan and Cromwell point out the irony that among the documents pointed to by plaintiffs as being fraudulently withheld is one which would have been to Bache's advantage, for it indicated that the CBOT's inquiry into the Spreads was completed, without a finding of any wrongdoing by Bache. Sullivan and Cromwell's arguments are persuasive as to the withheld CBOT documents and the publicly reported *Kotz* decision. However, even if Sullivan and Cromwell failed to consider the NYSE investigation while considering settlement in *Cresswell I* in 1985, there remains an inference which could be drawn that the firm acted with an intent to deceive when it represented to plaintiffs that all documents responsive to the Second Document Request had been turned over. Hence, summary judgment

cannot be granted to Sullivan and Cromwell on the grounds of a lack of intent.

*Materiality*

Although it has been established that a triable issue of fact exists as to whether Sullivan and Cromwell intended to withhold documents, Sullivan and Cromwell can still prevail on their motion for summary judgment if plaintiffs fail to establish that an issue of fact exists as to whether the withheld documents were material.

In Paragraph 35 of the Second Amended Complaint, plaintiffs allege that withheld documents were material:

> Knowledge of the Exchange Investigation and the consequential measures that would have been taken by Swan if he had had such knowledge, would greatly have strengthened the chances of the Prior Plaintiffs for success at trial. This would greatly have strengthened the Prior Plaintiff's bargaining position vis-a-vis Bache in the settlement negotiations.

Because there is no evidence to indicate that Sullivan and Cromwell knew about the December 5 or December 9 letters when responding to plaintiffs' Second Document Request, the Polly Gregory documents and the Letter of July 11, 1984 are the relevant documents to consider.

The standard for materiality in a fraud case is that the matter allegedly misrepresented must be reasonably certain to have a substantial effect on the plaintiff's decision. *Quintel Corp. v. Citibank*, 606 F.Supp. 898, 906 (S.D.N.Y.1985). Further, to be material, the information withheld "[m]ust go to the essential factual essence of the transaction." *Benz v. Kaderbeck*, 241 A.D. 583, 585, 272 N.Y.S. 558, 561 (4th Dep't 1934); *Uhlmann v. Hammons*, 74 N.Y.S.2d 66, 67 (Sup.Ct.N.Y.Co.1947). *See also Metropolitan Life Ins. Co. v. Union Trust Co.*, 268 A.D. 474, 482–83, 51 N.Y. S.2d 318, 325–26 (4th Dep't 1944), *aff'd*, 294 N.Y. 254, 62 N.E.2d 59 (1945) ("[i]t is not possible now to charge the defendant for failing to disclose what did not appear to be material at the time, and as to which there is no substantial evidence that the plaintiff considered it material.").

According to the plaintiffs, the withheld documents were material as establishing the existence of the Exchange investigation. Plaintiffs also urge that the amounts of subsequent settlements between Bache and investors establish by inference the materiality of the Exchange investigation. Finally, plaintiffs contend that a jury could infer materiality simply from the fact that Sullivan and Cromwell withheld the documents.

Although Swan, in his letter to the *Cresswell I* plaintiffs recommending settlement, explained that the issue in *Cresswell I* was whether plaintiffs, sophisticated investors, reasonably relied on the alleged misrepresentations—mostly oral—as to the risk associated with the Spreads transaction, and although Shippy, the Exchange official who handled the Exchange investigation, testified that the NYSE investigation into the marketing of the Spreads had "nothing to do with the individuals who were suing the firm," the test for materiality, unlike that for intent and reliance, is an objective one. *Quintel Corp. v. Citibank*, 606 F.Supp. at 906. In addition to the Polly Gregory documents, the July 11, 1984 letter from Bache to the Department of Enforcement evidenced that the NYSE Department was investigating the marketing of the Spreads. Whether knowledge of the existence of regulatory activity on the part of the NYSE was material depends not upon the perceptions of Swan or of Shippy, but rather on whether the information would have been reasonably certain to have had a substantial effect on a reasonable person. Once the reasonableness standard is introduced, it is difficult to deny that there is a factual issue as to the effect of an investigation by a regulatory body.

The settlements in *Merana* and *Reitz* which were completed after the public announcement of the NYSE decision accomplished a return in relation to claim significantly larger than that achieved by the settlement in *Cresswell I*. While *Cresswell I* plaintiffs settled for 46% of their claims, *Merana* settled for 93.99% of claimed losses, and *Reitz* settled for 71%, after Swan told Hardiman "that the New York Stock Exchange decision changes matters entire-

ly." The 71% settlement in *Reitz* occurred despite the fact that there was little discovery and no depositions in that case. These settlements constitute objective evidence to support the inference that knowledge of the NYSE investigation was material. *See Securities & Exchange Commission v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 851 (2d Cir.1968), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). While the settlements in *Merana* and *Reitz* are not admissible to prove Bache's liability pursuant to Rule 408 of the Federal Rules of Evidence, *United States v. Gilbert,* 668 F.2d 94, 97 (2d Cir. 1981), *cert. denied,* 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 469 (1982), they have probative value with respect to materiality, intent and reliance.

The circumstances surrounding the settlement of *Merana* and *Reitz* differed from *Cresswell I* in aspects other than the public knowledge of the NYSE action. They were the tail end of the litigation; the plaintiff in *Merana* filed an amended complaint including new claims, based more on negligence than on fraud; Berger, a different lawyer, pursued additional discovery, and had retained an expert witness; unlike the plaintiffs in *Cresswell I,* the plaintiffs in *Reitz* and *Merana* had not signed risk disclosure statements; and the German brochure used to market the Spreads to the plaintiffs in these cases was even less favorable to the Bache position. Notwithstanding these differences, the existence of these larger later settlements raises a triable inference that knowledge of the NYSE investigation was material.

The plaintiffs have support for the proposition that materiality can be inferred from nonproduction of the documents by Sullivan and Cromwell. *Consolidated Rail Corporation v. Nevins–Petrillo Warehouse & Distribution Systems, Inc.,* 619 F.Supp. 900, 906 (S.D.N.Y.1983). The inference of materiality from nonproduction turns again in large measure on the intent of Sullivan and Cromwell, already found above to constitute an issue of fact. While under other circumstances nonproduction might not infer materiality, here at least an issue of fact exists.

The effect of the existence of an investigation by a regulatory body, the greater amounts paid for settlement after the results of the investigation became known, and the withholding of the information concerning the investigation, all raise a factual issue as to whether or not the withheld information was material. Summary judgment dismissing the complaint on the basis of the absence of such an element must therefore be denied.

*Reliance and Loss Causation*

■ Even if Sullivan and Cromwell intentionally withheld documents, and even if the withheld documents were material, Sullivan and Cromwell's motion for summary judgment will be granted because the plaintiffs fail to raise a triable issue of fact with respect to the required element of reliance. *Lehman v. Dow Jones & Co., Inc.,* 783 F.2d 285, 295–96 (2d Cir.1986); *Seven Star Shoe Co., Inc. v. Strictly Goodies, Inc.,* 657 F.Supp. 917, 920 (S.D.N.Y.1987). In addition, plaintiffs have to show that the loss was "the direct, immediate, and proximate result of the fraudulent misrepresentation." *Goldberg v. Mallinckrodt, Inc.,* 792 F.2d 305, 307 (2d Cir.1986).

Swan knew not only about the Polly Gregory exchange but that Sullivan and Cromwell had not produced them in response to his request. By June, 1984, at Gregory's deposition, Swan knew that Bache had corresponded with the NYSE, and that Sullivan and Cromwell had in its possession documents which Swan considered to be responsive to the Second Document Request, but which had not been produced. Swan conceded that at least one of the documents marked by Burnett was responsive to his Second Document Request and had not been produced. Despite this, Swan did not ask Burnett—or anyone else at Sullivan and Cromwell—why any of the documents had not been produced in response to the Second Document Request or for the Polly Gregory file, nor was his document demand renewed or amended.

Under these circumstances, even if Swan did rely on Sullivan and Cromwell's representation, and even if he believed that the

failure to turn over the documents was an inadvertent omission, his reliance on Sullivan and Cromwell's representation was not reasonable. He never sought to depose Goldenblum, although he knew that Goldenblum had communicated with the Exchange. He did not contact the Exchange, even though he knew that the Exchange sometimes examined customer complaints. He did not contact the CBOT—the Exchange on which the Spreads were traded —about its investigation, nor did he discuss the activities of regulatory bodies with his clients or even with his associate. For all of these reasons, Swan could not have reasonably relied on Sullivan and Cromwell's response.

If the facts misrepresented "are not matters peculiarly within the party's knowledge, and the other party has the means available to him of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentations." *Cudemo v. Al. & Lou Construction Co.*, 54 A.D.2d 995, 387 N.Y.S.2d 929, 930 (3d Dep't 1976), *quoting Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 322, 157 N.E.2d 597, 600, 184 N.Y.S.2d 599, 603 (1959) (*quoting Schumaker v. Mather*, 133 N.Y. 590, 596, 30 N.E. 755, 757 (1892)). Similarly, if plaintiff "has been furnished with the means of knowledge and he is not prevented from using them he cannot say he has been deceived by the misrepresentations of the other party." *Frigitemp Corp. v. Financial Dynamics Fund, Inc.*, 524 F.2d 275, 282 (2d Cir.1975). *See also Rauenhorst v. United States*, 104 F.R.D. 588, 603 (D.Minn.1985) (where certain documents could have led plaintiffs to discover that information was withheld, but where plaintiffs did nothing, they could not claim to have acted in reliance upon the misrepresentations).

Swan's conclusory declaration that he relied upon Sullivan and Cromwell's representation is overcome by the undisputed facts set forth above. *See United States v. DeFilippo*, 647 F.Supp. 1355, 1358 (S.D.N.Y. 1986) (a sworn statement unsupported by facts does not warrant a finding in favor of declarant); *Sanders v. Douglas*, 565 F.Supp. 78, 80–87 (C.D.Cal.1983) ("[a]n affidavit containing ultimate facts or conclusions of law cannot defeat a summary judgment motion"). Plaintiffs have failed to establish reasonable reliance, and Sullivan and Cromwell's motion for summary judgment is thus granted.

*Gross Negligence*

██ In addition to the fraud claim, Sullivan and Cromwell have moved for summary judgment on plaintiffs' gross negligence claim. Like the fraud claim, a gross negligence claim requires proof of misrepresentation, reasonable reliance, materiality, causation and injury. *See International Products Co. v. Erie R. Co.*, 244 N.Y. 331, 338–39, 155 N.E. 662, 664, *cert. denied*, 275 U.S. 527, 48 S.Ct. 20, 72 L.Ed. 408 (1927). Here, as in the fraud claim, plaintiffs have failed to offer evidence sufficient to support a material issue of fact as to materiality of the withheld documents or reasonable reliance on Sullivan and Cromwell's misrepresentation.

In addition, an attorney does not owe a duty of care to the adversary of the client. *National Savings Bank v. Ward*, 100 U.S. (10 Otto) 195, 200, 25 L.Ed. 621 (1880), *Hakala v. Van Schaick*, 171 Misc. 418, 425, 12 N.Y.S.2d 928, 935 (1939). "It is well-settled that an attorney may not be held liable for negligence in the provision of professional services adversely affecting one with whom the attorney is not in contractual privity." *National Westminster Bank v. Weksel*, 124 A.D.2d 144, 146, 511 N.Y.S.2d 626, 628 (1st Dep't), *app. denied*, 70 N.Y.2d 604, 513 N.E.2d 1307, 519 N.Y.S.2d 1027 (1987). *See also Felson v. Miller*, 674 F.Supp. 975, 978–79 (E.D.N.Y.1987) (absent privity of contract or "special circumstances," trust beneficiary could not sue trustee under New York law).

Finally, in this court's opinion of July 1987, it was determined that a fraud case could be maintained against Sullivan and Cromwell because of the need to deter fraud, *Cresswell v. Sullivan and Cromwell*, 668 F.Supp. 166, 172 (S.D.N.Y.1987).

However, this court did not sanction a claim for gross negligence by the settling party against the attorneys for other settling party. Thus, under Fed.R.Civ.P. 60(b), the negligence claims should be dismissed.

*Punitive Damages*

Because summary judgment dismissing the fraud and gross negligence claims is granted, there is no need to determine whether punitive damages are available.

*Amendment of the Complaint*

■ Plaintiffs have moved to further amend their Second Amended Complaint to add a claim for relief under § 487 of the New York Judiciary Law.[10] As Fed.R.Civ. P. 15(a) provides, leave to amend a complaint should be "freely given." However, it is not granted in every case, since "leave to amend should be permitted *in the absence of an apparent or declared reason,* such as undue delay, bad faith, or undue prejudice to the opposing party." *Tokio Marine & Fire Insurance Co. v. Employers Insurance of Wausau,* 786 F.2d 101, 103 (2d Cir.1986) (quoting *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) (emphasis added)).

Plaintiffs' first complaint was filed in April, 1987, the Amended Complaint in May, 1987, and the Second Amended Complaint in March, 1988. On September 30, 1988, nearly three months after Sullivan and Cromwell moved for summary judgment, plaintiffs sought, once again, to amend their complaint.

When a motion for summary judgment is pending, courts have denied leave to amend on grounds of undue delay and prejudice. *See, e.g., Layfield v. Bill Heard Chevrolet Co.,* 607 F.2d 1097, 1098–99 (5th Cir.1979) (per curiam), *cert. denied,* 446 U.S. 939, 100 S.Ct. 2161, 64 L.Ed.2d 793 (1980); *Kirby v. P.R. Mallory & Co.,* 489 F.2d 904, 912 (7th Cir.1973), *cert. denied,* 417 U.S. 911, 94 S.Ct. 2610, 41 L.Ed.2d 215 (1974). Here,

Sullivan and Cromwell moved for summary judgment on all claims in July. The motion to amend was made on September 30. Although a court "may not properly deny an amendment solely on the ground of delay," the burden is on the movant "to show 'some valid reason for his neglect and delay.'" *Sanders v. Thrall Car Mfg. Co.,* 582 F.Supp. 945, 953 (S.D.N.Y.1983), *aff'd,* 730 F.2d 910 (2d Cir.1984), *quoting Hayes v. New England Millwork Distributors, Inc.,* 602 F.2d 15, 19–20 (1st Cir.1979) (*quoting Freeman v. Continental Gin Co.,* 381 F.2d 459, 469 (5th Cir.1967)).

According to the declaration submitted by counsel for the *Cresswell II* plaintiffs, the reason that no claim under § 487 was included in the first Complaint, the Amended Complaint, or the Second Amended Complaint is that he "first became aware of it in the course of preparing papers in opposition to the pending motion for summary judgment." However, where a plaintiff "advances no reason for his extended and undue delay other than ignorance of the law, such a failure has been held an insufficient basis for leave to amend." *Goss v. Revlon, Inc.,* 548 F.2d 405, 407 (2d Cir. 1976).

The statute at issue here is not new—indeed, Sullivan and Cromwell points out that it has been in force "in substantially its present form" for over a century. Mem. at 4. *See also Sanders v. Thrall Car Manufacturing Co.,* 582 F.Supp. at 952–53 (where plaintiff moved to amend complaint to add a statute enacted nearly a decade earlier on the grounds that counsel for plaintiff had been unfamiliar with the statute, court refused to allow amendment). Further, no authority has yet found the statute applicable in circumstances such as these. The language of the statute speaks in terms of obstruction of justice rather than a deliberate failure to comply with discovery requirements, unimaginable at the time of statutory enactment.

---

**10.** According to § 487:
An attorney or counselor who:
  1. Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party; or,
  2. Wilfully delays his client's suit with a view to his own gain; or, wilfully receives any money or allowance for or on account of any money which he has not laid out, or becomes answerable for,
  Is guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action.

Thus, because plaintiffs have waited too long to seek this amendment, and because to allow the amendment at this late stage would unduly prejudice Sullivan and Cromwell and because the amended claim would raise or fall on the initial allegations, the motion to further amend the complaint is denied.

*Consolidation of Trial*

The *Meadows* plaintiffs have moved pursuant to F.R.Civ.P. 42(a) to consolidate the *Cresswell* and the *Meadows* actions on the grounds that both cases have common questions of law and fact, and that consolidation will avoid unnecessary costs. Both the *Cresswell* plaintiffs and Sullivan and Cromwell oppose consolidation largely on grounds that it may delay the trial of this case. Because summary judgment has been granted, it is unnecessary to decide the issue of consolidation at this stage.

*Conclusion*

For the reasons set forth above, Sullivan and Cromwell's motion for summary judgment on the Second Amended Complaint is granted. Plaintiff's motion to amend the Second Amended Complaint, the *Meadows* plaintiff's motion to consolidate, and Bache's motion to preclude the testimony of Swan are denied.

It is so ordered.